622 So.2d 1325 (1993)
Enrique GARCIA, Appellant,
v.
STATE of Florida, Appellee.
No. 75961.
Supreme Court of Florida.
June 24, 1993.
Rehearing Denied September 3, 1993.
*1326 Larry Helm Spalding, Capital Collateral Representative, Martin J. McClain, Chief Asst. CCR and Judith J. Dougherty, Asst. CCR, Office of Capital Collateral Representative, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
SHAW, Justice.
Garcia appeals the denial of his rule 3.850 motion for postconviction relief. We have jurisdiction. Art. V, § 3(b)(1); Fla. R.Crim.P. 3.850. We reverse.
The facts of this case are set out fully in our opinion on direct appeal. See Garcia v. State, 492 So.2d 360 (Fla.), cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986). Garcia was convicted of two counts of first-degree murder for his role in the robbery of a farm store in which two persons were killed. In accordance with the jury's eight-to-four vote, the judge imposed the death penalty for both crimes, finding three aggravating[1] and one mitigating circumstance.[2] We affirmed. Garcia subsequently filed the present rule 3.850 motion for postconviction relief, which was denied following an evidentiary hearing. Garcia appeals.
Garcia raises twenty-three issues,[3] a number of which are procedurally barred because they were either raised on direct *1327 appeal[4] or could have been so raised if properly preserved.[5] Of those remaining, we dismiss three without discussion.[6]
Initially, we find Garcia's allegation in Issue 1 that the trial court failed to conduct a fair evidentiary hearing on the rule 3.850 motion to be without merit. The trial court cut off defense counsel's questioning of witnesses at several points, but only after asking defense counsel the purpose of the questioning and determining further inquiry irrelevant. We find no abuse of discretion.

I. INEFFECTIVENESS OF TRIAL COUNSEL
In Issue 2 Garcia claims trial counsel was ineffective during the penalty phase because he should have had the mental health expert, Dr. Ritt, testify, and because he failed to present testimony of Grover Yancey concerning statements made by codefendant Torres.[7] We discuss each below.
Garcia's claim that counsel was ineffective for failing to have the mental health expert, Dr. Ritt, testify during the penalty phase is without merit. The decision was a tactical one. Had Dr. Ritt testified, he would have been subject to cross-examination concerning damaging admissions Garcia had made to him.
Prior to discussing the remainder of Issue 2, it is necessary to set forth additional facts. During the robbery of the farm store on October 8, 1982, the store owners, Willie and Martha West, were killed, and the cashier, Rosenna Welsh, wounded.[8] Four persons committed the robbery: Benito Torres (also known as Benito Contreras, or Benny), age thirty; Louis (Gordo) Pina, age twenty; the defendant, Enrique (Ricky) Garcia, age twenty; and a minor, Urbano (Junior) Ribas, age seventeen. Of the four, Garcia was tried first and only he was sentenced to death, as explained below. The question of who was actually the "shooter" or "shooters" was a central issue in Garcia's trial.
After he and Louis Pina were arrested on the day of the robbery, Garcia made several statements to police in which he repeatedly referred to the participants in the crime as Benny Contreras, Louis Pina, himself, and a fourth person who was Benny's friend. Initially, Garcia never used the name Urbano Ribas when speaking of the fourth participant, but instead used the name Joe, or Jose, Perez. In one statement, which was later submitted to the jury, Garcia described the codefendants' respective roles in the crime  Benny and Joe Perez were the shooters, with Benny shooting one woman, and Perez shooting the other woman and man.[9] In a separate *1328 statement given three days after he was arrested, which was also submitted to the jury, Garcia stated conclusively that Benny's friend, Joe Perez, who allegedly shot two of the victims, is the same person as Urbano Ribas, the seventeen year old codefendant.[10]
Prior to trial, codefendant Benny Torres shared a prison cell with Grover Yancey, and Torres spoke of the crime to him on a number of occasions. On March 30, 1983, Yancey gave a statement to one of the prosecutors, which was disclosed to defense counsel, that substantially corroborated Garcia's version of the shootings. Yancey said that Torres confessed to him that he shot one woman and that the minor, the "17 year old kid," shot the other two persons.[11] As noted above, Urbano Ribas, *1329 whom Garcia identified as Joe Perez, was the only codefendant who was seventeen years old at the time of the crime.
Garcia's appointed counsel declined to introduce Yancey's statement at trial and now, as the second part of Issue 2, Garcia claims that this constituted ineffectiveness. On collateral review, trial counsel Bone stated that he did not use the statement in the penalty phase because he considered it to be inadmissible hearsay. Garcia correctly points out, however, that the exclusionary rules of evidence, including the rule barring use of hearsay statements, are inapplicable in the penalty phase of a capital trial. Section 921.141(1), Florida Statutes (1979), provides in part:
In the [penalty] proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
Thus, the hearsay rule was not an automatic bar to Yancey's statement.
We conclude that trial counsel's failure to seek admission of Yancey's statement during the penalty phase constitutes ineffectiveness under the two-pronged Strickland test. See Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984) (counsel's error must be both "[un]reasonable considering all the circumstances" and sufficiently prejudicial "to undermine confidence in the outcome"). Counsel's failure to comprehend the most fundamental requirement governing the admissibility of evidence in capital sentencing proceedings was clearly unreasonable, particularly where the provision is set out plainly in Florida Statutes. The error also was sufficient to undermine confidence in the jury recommendation of death. The fact that a number of months after the crime codefendant Torres, in a statement adverse to his own self-interest, allegedly told Yancey substantially the same version of the shootings that Garcia himself had told police on the night of the killings  that Torres shot one woman, and Ribas, the seventeen-year-old known to Garcia as Joe Perez, shot the other two persons  would have immeasurably bolstered Garcia's claim that he was not a shooter. We note that four jurors voted for life imprisonment even in the absence of Yancey's statement.

II. BRADY VIOLATION
Garcia points out in Issue 4 that in spite of Garcia's identification of Jose Perez as Urbano Ribas in his statement to police three days after the shootings, the state attorney in his opening argument to the jury nevertheless claimed that Joe Perez never really existed  that when Garcia referred to Perez's deeds (i.e., the shooting of two victims) in his statements to police, he was in fact referring to his own acts:
You will hear later [from us, the State,] that there never was a Joe Perez... .
....
Again: Who is Joe Perez?
The evidence will convince you, I believe, in this case that Joe Perez is none other than Enrique Garcia, devised by Garcia because he wanted to cover up and not testify against himself... .
The state attorney explicitly argued that Joe Perez is not the same person as Urbano Ribas:
Monday, three days after these crimes, the Defendant was questioned again. *1330 Now, he artfully and untruthfully says, Joe Perez is none other than Junior Ribas, one of the four. But this won't work then or today.
Later, in his closing argument, the state attorney hammered away at the same point  that Joe Perez and Garcia are one and the same person and Garcia was thus a shooter by his own words:
Now, I argued to you in the beginning of this trial that there was a fictional Joe Perez, and you know now that that is true ... Ricky Garcia used Joe Perez as the strawman.
I think that you can find that whenever anything bad was done in the statements, it was done by Joe Perez, and I think you can find by and large that Joe Perez is the defendant Garcia here.
You heard the defendant say in the statement finished just before midnight on the day of the execution and robberies, that at the store, Joe Perez and Benny were the ones who went in and said that there was a holdup; that is, the defendant would do that. It was Benny and the defendant who went in and said it was a holdup.
You heard him say in that statement that Benny and not Louis Pina, but Joe Perez. So, Benny and Joe Perez did the shooting. Benny and Garcia did the shooting.
Garcia now claims that the State withheld from the defense a key statement given to police by Lisa Smith, who turned Ribas in to police on the night of the shootings. The taped and transcribed statement, dated October 19, 1982, directly contradicts the state attorney's opening and closing arguments. Rather than showing that Joe Perez never existed and was instead a fictitious character created by Garcia during questioning, the statement shows just the opposite  that Urbano Ribas identified himself to police as Perez when he was first arrested and that he had identification papers in that name:
Q. And then what happened when [the police] got there?
A. O.K. Um, the guy walked up to my door and then, as, Urbano Ribas was going out my front door and he turned around, and he just says hey you, come back here, don't, you know, don't run. Come here. So he turned around and walked out and then he put him up against the wall and searched him and got my wallet out but they didn't get my money out and shortly after that a couple Sheriff's Department cars came up. Marked cars.
Q. O.K. Now, when the police department, Bradenton Police Department got there and they searched Urbano.
A. Um hum (yes).
Q. What did Urbano say to them?
A. Ah, that his name was something else, something Perez. Cause that's the last name he used. Perez.
Q. [By Detective David Perez] And he had, ah, ah, Florida birth registration card that had that name on it.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court ruled that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). It is irrelevant whether the prosecutor or police is responsible for the nondisclosure; it is enough that the State itself fails to disclose. See, e.g., Williams v. Griswald, 743 F.2d 1533, 1542 (11th Cir.1984).
In the present case, the Smith statement was immaterial as to guilt, since there is no reasonable probability that the verdict would have been different had it been disclosed in light of the extensive evidence showing Garcia's complicity in the crime. However, the statement was clearly *1331 material as to penalty,[12] for it would have eviscerated the State's theme that Joe Perez did not exist and that whatever deeds Garcia attributed to Perez in his initial statement to police were in fact Garcia's own acts. Because Lisa Smith said exactly the same thing that Garcia said in his statement to police three days after the crime  that Joe Perez is the same person as Urbano Ribas  the statement would have greatly aided the defense in arguing that Ribas, not Garcia, was a shooter, and Garcia was thus undeserving of the death penalty. The State's failure to disclose the statement undermines the integrity of the jury's eight-to-four recommendation of death and constitutes a clear Brady violation.[13]

III. PROSECUTORIAL IMPROPRIETY
Garcia claims in Issues 5 and 10 that the withholding of the Smith statement when coupled with the State's opening and closing arguments constituted prosecutorial misconduct that deprived Garcia of a fair trial. We note that while the State is free to argue to the jury any theory of the crime that is reasonably supported by the evidence, it may not subvert the truth-seeking function of the trial by obtaining a conviction or sentence based on deliberate obfuscation of relevant facts. In the present case, there is simply insufficient evidence in the record to sustain the State's argument that Joe Perez was a nonexistent person created by Garcia during questioning. The available evidence shows otherwise  that Perez was a common alias for Urbano Ribas.
The Perez/Ribas link was common knowledge with the State. At the time Ribas identified himself as Perez to Bradenton police on the night of the shootings, Garcia, who was in custody at the Sheriff's Department, had not yet told county detectives that Joe Perez was a coperpetrator.[14] When deputies arrived in Bradenton shortly after Ribas was arrested to question him, he was identified not as Joe Perez, but Urbano Ribas, and was transported to the Sheriff's Department, booked under that name, and eventually released.[15] Meanwhile, Garcia made his statement to county detectives Stout and David Perez implicating Joe Perez, and as soon as Detective Stout learned of the Perez/Ribas connection from local witnesses, he ordered Ribas rearrested:[16]

*1332 At approx. 1054 hrs. Dep. W. Riley advised [me, Deputy H. Ordez,] by phone that he had found two witnesses ... who had informed him that the subject Jose Perez and Urbano Ribas, Jr. were one in the same.
Det. G. Stout[[17]] was called and informed of the situation.
Det. W. Riley was advised per Det. Stout to take Mr. Ribas into custody.
At about 1420 hrs. Dep. Riley arrived at HQ with Mr. Ribas... .
By the next day, Detective Stout was so sure of the link he showed Garcia a single photograph  Urbano Ribas  to confirm the identity of Joe Perez. And by the following week, when Detective David Perez interviewed Lisa Smith at the Sheriff's Department, county police unquestionably understood that Ribas had initially identified himself as Perez and used a birth registration card in that name.
For the State prosecutorial team[18] to argue on this record that Joe Perez was a nonexistent person created by Garcia during questioning constitutes an impropriety sufficiently egregious to taint the jury recommendation. Once again, we are compelled to reiterate the need for propriety, particularly where the death penalty is involved:
Nonetheless, we are deeply disturbed as a Court by continuing violations of prosecutorial duty, propriety and restraint. We have recently addressed incidents of prosecutorial misconduct in several death penalty cases. As a Court, we are constitutionally charged not only with appellate review but also "to regulate ... the discipline of persons admitted" to the practice of law. This Court considers this sort of prosecutorial misconduct, in the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings. It ill becomes those who represent the state in the application of its lawful penalties to themselves ignore the precepts of their profession and their office.
Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985) (citations omitted). See also Nowitzke v. State, 572 So.2d 1346 (Fla. 1990).

IV. CONCLUSION
As noted above, Garcia was the only one of the four codefendants sentenced to death. Benito Torres, an allegedly self-confessed shooter of one victim, pled guilty to two counts of first-degree murder and was sentenced to two concurrent life terms. Louis Pina was tried and found guilty of two counts of first-degree murder and sentenced to two consecutive life terms. And the minor, Urbano Ribas, an alleged shooter of two victims, entered a plea of nolo to two counts of first-degree murder and was sentenced to two concurrent life terms. Although this Court affirmed Garcia's death sentences in spite of the life sentences given the codefendants, much of the information addressed in our present opinion was not briefed or available on direct appeal. This information raises real questions requiring factual resolution concerning the extent of Garcia's participation in the shootings.
Based on the foregoing, we reverse the denial of postconviction relief, vacate Garcia's death sentences, and remand for resentencing before a new jury on the first-degree murder convictions.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] The judge found that the murders were committed during the course of a robbery, were committed for the purpose of avoiding lawful arrest, and were especially heinous, atrocious or cruel. See § 921.141, Fla. Stat. (1981). We note that the jury was not instructed on the heinous, atrocious, or cruel aggravator, so the United States Supreme Court's recent decision in Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), is inapplicable.
[2] The judge found that Garcia had no significant history of prior criminal activity. See § 921.141, Fla. Stat. (1981).
[3] Garcia makes the following claims: 1) The circuit court erred in the manner in which it conducted the evidentiary hearing; 2) trial counsel was ineffective in the penalty phase; 3) Garcia was denied adequate mental health assistance; 4) the State intentionally withheld material evidence; 5) the State introduced false and misleading evidence; 6) trial counsel was ineffective at the guilt phase; 7) trial court erred in denying Garcia's request for additional peremptories; 8) improper juror conduct; 9) defense was wrongly precluded from cross-examining a State witness; 10) improper prosecutorial comments; 11) improper and misleading instruction as to the elements of attempted murder; 12) jury's sense of responsibility was diluted; 13) instruction on aggravating circumstances improperly shifted burden of proof to defendant; 14) prosecutor asserted that sympathy for the defendant was improper; 15) death sentence was based on an automatic aggravating factor  robbery; 16) death sentence is disproportionate and cruel and unusual because Garcia was not the shooter; 17) finding of HAC was improper; 18) trial court refused to permit additional mitigating evidence and to find mitigating circumstances that were clearly established; 19) jury was denied right to hear evidence relating to the age of the defendant; 20) trial court failed to provide a factual basis for its sentence; 21) State argued nonstatutory aggravating factors; 22) State injected racial factors into the trial; 23) trial court improperly found as an aggravating factor that the crime was committed to avoid lawful arrest.
[4] Issues 16, 17, 18, 20, and 23 were raised in various sections of Garcia's initial brief on direct appeal.
[5] Issues 7, 8, 9, 11, 12, 13, 14, 15, 19, 21, and 22 could have been so raised on direct appeal, if properly preserved.
[6] Issues 3 and 6 are clearly without merit. Garcia's proportionality claim under Issue 16 pursuant to Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), Edmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Jackson v. State, 575 So.2d 181 (Fla. 1991), must fail because the perpetrators here planned to eliminate witnesses and Garcia knew this.
[7] We decline to address Garcia's claim that trial counsel was ineffective in failing to adequately investigate, prepare and present available mitigating evidence.
[8] Willie West was shot once in the head. Martha West was shot five times; four times in the head and once in the arm. Rosenna Welsh was shot approximately five times throughout her body.
[9] Garcia's statement contains the following dialogue in which the fourth participant is identified extensively as Joe Perez and is credited with shooting a woman and man:

A. We wait there `til one  well, it was one, because when people from the factory, or whatever there is back there, they were still eating, so we waited until they got through.
They left and then we went there. We went in, and Benny and Joe Perez 
Q... . Okay, hold it right there. Who is we?
A. Me, Louis and Joe Perez and Benny Contreras.
Q. Okay, so it was Benny Contreras, Jose Perez 
A. Louis Pina.
Q. Louis Pina and yourself.
A. Okay, and Jose had a gun and Benny had a gun and they said hold it.
I told them, well, I'm going to go get the other guy so he can get the money. So, when I was doing that, they were talking to the guy. So when me and that guy went back in, we grabbed the money and the guy was saying that where is the rest of the money?
Q. Who was saying this?
A. Benny Contreras. He said, "Where's the rest of the money?" and that lady said, "What other money?" He said, "The money that your husband went to get at the bank."
She said, "I told you we just had a little bit." And he said, "No, you're lying."
Q... . How much money did you get?
A. It was twenty-two dollars each.
Q. Apiece?
A. Yeah; There's where I said it wasn't worth killing.
So, he said: Well, it was either that way or leave everything. So, I said 
Q... . Okay, who did the shooting?
A. Benny Contreras and 
Q... . and Louis?
A. No; Joe Perez.
Q. Joe Perez and Benny?
A. Yeah; at that time when they were going to shoot, me and Louis went to the car.
... .
Q. Did you hear any noise when you heard the gun fire, hear anybody say anything?
A. Yeah; we were hearing that lady going: ouch, ouch, ouch. She was saying ouch, Benny, ouch, because he was shooting.
Q. Which lady?
A. I wouldn't know.
Q. The fat lady or the skinny lady.
A. I don't know. By that time we were walking out the door.
Q. She was just saying ouch?
A. Umm-umm. He said he put seven or eight bullets in her, so I wouldn't know.
Q. Pretty close, he put five in her; Benny is the one that shot her?
A. Yeah, the fat lady.
Q. Who shot the man, do you know?
A. Yeah, the other guy.
Q. Which guy?
A. Joe Perez.
Q. How do you know that?
A. Because he was saying he shot two women. Benny was supposed to have shot two and he only shot one.
Q. Okay, Joe Perez shot the old man and the old lady and Benny shot 
A. An old lady, because that lady knew Benny already.
[10] Garcia's statement contains the following discussion in which he unequivocally says that Joe Perez is the same person as Urbano Ribas:

Q... . You don't know that guy's name other than Joe Perez?
A. No, I don't know his real name... .
... .
Q. Let me get a picture of him; how's that?
A. All right.
Q... . Okay, just for the record, at this time I'm showing Ricky Garcia a picture of Junior Ribas;
Is that him?
A. Yeah.
Q. For sure?
A. Umm-humm.
Q. Is there any question in your mind that's not him?
A. No.
Q... . Okay. Now, that's the guy you've been calling who?
A. Joe Perez.
[11] Yancey's statement contains the following dialogue in which he says that Torres confessed to him that he shot the woman who lived and the minor shot the other two:

Q. Well, what did he tell you that they did?
A. He said they went in the store, you know, they told them it was a robbery. He said his friend handed him a gun inside the store. He took the gun and his friend shot. It was maybe about eight shots. I'm not sure but it was eight or over. Eight or more. And he said he turned his head, he took, like it was a .22, he told it was a .22, he turned his head and he shot 5 times. Hit the lady across the chest.
Q. Did he say how many people he shot?
A. Well, he said he shot the lady. The one that lived. And his friend shot the man and the woman.
... .
Q. Did he ever tell you the names of the other people involved?
A. Yea, he told me the names. He told me the ages too. He said he was the oldest one. He said he was 30.
... .
Q. Well, you said that there was he [i.e., Torres] and another person doing the shooting.
A. Right.
Q. Who was doing the other shooting? Do you know which one?
A. I think that guy's name was ... 17 year old kid. Yea, 17 year old kid. [Ellipsis in original.]
[12] The Smith statement unquestionably was in the possession of the State. The crime took place, and the case was tried, in Manatee County, and the Manatee County Sheriff's Department was the principal investigative agency. The Smith interview was conducted in the interrogation room of the Sheriff's Department by Detective David Perez, who also witnessed the initial questioning of Garcia. According to the sworn testimony of investigator Paul Harvill, the Smith statement was obtained by the defense in 1988 under the Public Records Law, chapter 119, Florida Statutes (1979), from one of three "banker's boxes" containing the Garcia file in the Manatee County State Attorney's Office in Bradenton. The statement, labeled with Garcia's case number, was transcribed by Carolyn Whitney, Secretary, Criminal Investigations Bureau, Manatee County Sheriff's Department, and proffered to the court on collateral review as Defense Exhibit Number 21.
[13] Garcia's additional claim in Issue 4 that the State withheld important impeachment evidence concerning inmate Huewitt's past arrests and prior role as an informant as well as other useful information is without merit. The trial court heard the evidence on this claim, found no failure on the State's part to disclose relevant evidence, and concluded that even if all the allegedly withheld evidence had been presented, there is no reasonable probability that the outcome would have been different. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The record contains competent substantial evidence to support this finding.
[14] Lisa Smith called Bradenton police at about 11 p.m., Friday, October 8, the night of the shootings, to report Ribas' statements concerning the crime. Bradenton officers arrived five minutes later and Ribas identified himself as Perez. Based on Ribas' statements to Smith and others  not on his identity  Manatee County deputies were dispatched to interview Ribas in Bradenton at 11:23 p.m., and Ribas was identified and booked at the Sheriff's Department as Urbano Ribas some time later. The Garcia interview began at 11:25 p.m. and was completed at 11:58 p.m. at the Sheriff's Department.
[15] See the report of Deputy T. Post, dated October 9, 1982.
[16] See Deputy Ordez's report, dated October 10, 1982.
[17] Detective Greg Stout of the Manatee County Sheriff's Department, mentioned in this October 10 incident report, is the same officer who conducted both the October 8 interview of Garcia, wherein Garcia spoke extensively of Joe Perez, and the October 11 interview, wherein Garcia was presented with a photograph of Ribas whom he identified as Joe Perez. We note that a report filed by Detective Stout on October 14 indicates that codefendant Louis Pina, Garcia's friend, also did not know the seventeen year old minor, Benny's friend, by the name of Urbano "Junior" Ribas.
[18] The case was prosecuted by a team of three state attorneys against Garcia's single appointed counsel.