657 So.2d 1129 (1995)
Paul William SCOTT, Appellant,
v.
STATE of Florida, Appellee.
Paul William SCOTT, Petitioner,
v.
Harry K. SINGLETARY, Respondent.
Nos. 84686, 84687.
Supreme Court of Florida.
March 16, 1995.
Rehearing Denied July 20, 1995.
Martin J. McClain, Chief Asst. CCR, Office of the Capital Collateral Representative, Tallahassee, for appellant/petitioner.
Robert A. Butterworth, Atty. Gen. and Celia A. Terenzio, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Paul Scott appeals the trial court's denial of his third rule 3.850 motion to vacate his conviction of first-degree murder and his sentence of death.[1] Scott also petitions for a writ of habeas corpus[2] and requests a stay of execution. We have jurisdiction. Art. V, § 3(b)(1), (9), Fla. Const.
This case has an extensive procedural history covering fifteen years of proceedings in both the state and federal courts. Scott was sentenced to death for the 1978 first-degree murder of James Alessi. This Court affirmed both the conviction and sentence on direct appeal. Scott v. State, 411 So.2d 866 (Fla. 1982). In his petition for rehearing of that decision, Scott expressly requested that we address his culpability as compared to the culpability of his accomplice, Richard Kondian, who, as a result of a guilty plea, had received a sentence of forty-five years imprisonment. We denied that petition. Scott v. State, 419 So.2d 1058 (Fla. 1982). Next, Scott petitioned this Court for a writ of habeas corpus and a writ of error coram nobis, which was denied. Scott v. Wainwright, 433 So.2d 974 (Fla. 1983). Scott's *1130 first rule 3.850 motion was dismissed without prejudice for the failure to file a motion that included a proper oath. Scott v. State, 464 So.2d 1171 (Fla. 1985). Scott corrected the problem with the oath and filed a verified 3.850 motion. An evidentiary hearing was held in the trial court and relief was denied. This Court affirmed. Scott v. State, 513 So.2d 653 (Fla. 1987).
A death warrant was signed for Scott on October 19, 1990, and this Court granted a stay to allow new postconviction counsel the opportunity to file a second 3.850 motion. The trial court denied this second motion without an evidentiary hearing, and this Court affirmed. Scott v. Dugger, 634 So.2d 1062 (Fla. 1993). We also denied relief in his second petition for writ of habeas corpus. Scott v. Dugger, 634 So.2d 1062 (Fla. 1993).
Scott has sought relief in the federal courts, including federal habeas corpus relief in the United States District Court. This petition was denied in Scott v. Dugger, 686 F. Supp. 1488 (S.D.Fla. 1988), aff'd, 891 F.2d 800 (11th Cir.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990). The Eleventh Circuit also denied Scott's recent request to recall its mandate. Scott v. Singletary, 38 F.3d 1547 (11th Cir.1994).
When the governor signed Scott's current death warrant on September 30, 1994, Scott filed his third motion for rule 3.850 relief. The trial court denied relief without an evidentiary hearing. Because the present motion is successive and was filed after the expiration of the time limits set forth in rule 3.850, Scott based his claims on newly discovered evidence that he asserts demonstrates reversible error. Principally, he contends that the State violated the principles of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing: (1) a statement by Dexter Coffin, a cellmate of Scott's codefendant Richard Kondian, in which Coffin states he told a police officer that Kondian admitted killing the victim; (2) a statement by Robert Dixon, in which Dixon states he told a police officer that Kondian was angry with Scott for running out on him at the murder scene; and (3) a medical examiner's photograph that suggested that Kondian had struck the fatal blow by hitting Alessi on the head with a champagne bottle. Scott claims that, in light of this newly discovered evidence, we should revisit our ruling in Scott v. Dugger, 634 So.2d 1062 (Fla. 1993), and grant a new sentencing hearing.
Scott argued at trial that he ran out the back door before the victim was killed and that it was his co-defendant, Kondian, who was truly the killer. Scott now claims that the State, prior to trial, had in its possession information from two witnesses that supported this contention, but that the State failed to disclose this to the defense. In his present motion for post-conviction relief, Scott presented to the trial court affidavits from these two witnesses.
In the first affidavit, Dexter Coffin swears to the following:
3. Richard Kondian and I were both placed in the Captain's Cell. [Police informant] Captain Donnelly pulled me aside soon after I arrived at the jail and told me he wanted my help getting information from Richard Kondian. From that point on, we had daily meetings in which I briefed the state on anything that Richard Kondian revealed to me about the murder of James Alessi.
4. It turned out that Richard Kondian did end up confiding in me and asking for my advice quite a bit. Actually, many of the inmates asked for my advice because they felt that I understood the law. In seeking advice, Rick would tell me a lot about what happened on the night that the victim was killed. Rick clearly stated to me many times that he killed James Alessi or "that fag," as Rick would call him. Rick specifically told me that he "beat the shit out of him and killed him" by hitting him over the head. He was talking about how he killed James Alessi and he never mentioned anything about Paul Scott helping him.
5. In my daily meetings with Captain Donnelly and the representatives of the state, I would divulge to them whatever I had learned from Rick. I repeatedly informed them that Rick said that he was responsible for killing James Alessi. I told them what Rick said about beating the shit *1131 out of and killing the victim by beating him over the head.
In the second affidavit, Robert Dixon makes the following claims:
2. In 1978, I was living in Ft. Lauderdale, Florida. I was living with two people in a hotel on Birch Street. Their names were Rick and Sunshine. Rick was about 5' 8" with long dark wavy hair. I lived with Rick and Sunshine for about two weeks.
3. Rick was a hustler. At that time Rick was hanging out with a known homosexual. The homosexual man owned a flower shop. Rick was spending time with this man for at least a week. I remember one time when this homosexual man dropped Rick off at the hotel where we were staying.
4. One night, I was at a pool hall with a man named Allan Brasher. Allan told me that he was supposed to go back to the hotel, meet Rick, and go have dinner with the homosexual man. Allan did not want to go with Rick so he stayed at the pool hall with me. We were playing pool at a place called The Elbow Room.
5. Later that night, I went back to the hotel. Paul's old lady told me that Paul left with Rick. I met Paul Scott for the first time two to three days prior to that night.
6. I stayed in the room with Paul's old lady. Later that night Rick and Paul came in. When they came in, I knew something had happened. Rick was in an uproar. He was pacing around, very demanding and yelling at Paul Scott for running out on him. Rick also called Paul a punk. Rick was also saying things like, "Let's go. Pack your shit. We got to get the fuck out of here."
... .
9. While we were traveling, I became aware that the police were after Paul. I asked him what happened and he said, "I didn't do it." At that point, I didn't know what happened. But I did know that Paul went along with Rick only because Allan did not want to go. Rick was calling the shots.
... .
11. The police threatened to charge me with accessory to murder unless I told them where was the last place I was with Paul. I told them that we split up in Sacramento. I also remember the police showing me pictures of the victim. I told the police about what happened in the motel room and the things Rick said.
In addition to these two statements, Scott has made an unrebutted showing that the state failed to disclose a crime scene photograph supportive of his claim that the murder weapon was a wine bottle previously linked to Kondian. Scott has attached a statement from the medical examiner who opines that the photograph, which was not introduced at trial, supports the view that the wine bottle was the murder weapon.
Recently, in Garcia v. State, 622 So.2d 1325 (Fla. 1993), this court was faced with a similar claim that the state had withheld evidence of the participation of a co-defendant. In Garcia, we observed:
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court ruled that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). It is irrelevant whether the prosecutor or police is responsible for the nondisclosure; it is enough that the State itself fails to disclose. See, e.g., Williams v. Griswald, 743 F.2d 1533, 1542 (11th Cir. 1984).
In the present case, the Smith statement was immaterial as to guilt, since there is no reasonable probability that the verdict would have been different had it been disclosed in light of the extensive evidence showing Garcia's complicity in the crime. *1132 However, the statement was clearly material as to penalty, for it would have eviscerated the State's theme that Joe Perez did not exist and that whatever deeds Garcia attributed to Perez in his initial statement to police were in fact Garcia's own acts. Because Lisa Smith said exactly the same thing that Garcia said in his statement to police three days after the crime  that Joe Perez is the same person as Urbano Ribas  the statement would have greatly aided the defense in arguing that Ribas, not Garcia, was a shooter, and Garcia was thus undeserving of the death penalty. The State's failure to disclose the statement undermines the integrity of the jury's eight-to-four recommendation of death and constitutes a clear Brady violation.
622 So.2d at 1330-31 (footnotes omitted); see also Lightbourne v. Dugger, 549 So.2d 1364, 1365 (Fla. 1989) ("Accepting the allegations [of the State's failure to disclose] at face value, as we must for purposes of this appeal, they are sufficient to require an evidentiary hearing with respect to whether there was a Brady violation.").
We note that the jury in Scott's case recommended death by a vote of seven to five. In contrast, the co-defendant, Kondian, was permitted to plead to second-degree murder after Scott's trial, was given a 45-year sentence, and according to Scott is now free.
We conclude that the trial court erred in failing to hold an evidentiary hearing on the above claims.[3] We remand for an evidentiary hearing on the issues addressed in this opinion. We have by separate order issued a stay.
It is so ordered.
SHAW, HARDING and ANSTEAD, JJ., concur.
KOGAN, J., concurs with an opinion, in which ANSTEAD, J., concurs.
GRIMES, C.J., dissents with an opinion, in which OVERTON and WELLS, JJ., concur.
OVERTON, J., dissents with an opinion.
KOGAN, Justice, concurring.
The pivotal point of this case is that the co-perpetrator Richard Kondian entered into a plea agreement that resulted in only a forty-five year prison term. Today, Mr. Kondian is a free man. Florida law is well settled that death is not a proper penalty when a co-perpetrator of equal or greater culpability has received less than death. Harmon v. State, 527 So.2d 182 (Fla. 1988). Thus, the overriding question today is whether Mr. Kondian's culpability vis-a-vis that of Mr. Scott might be judged differently in light of the alleged Brady material.
In determining the answer, it is irrelevant that Scott previously claimed Kondian was the murderer in any prior proceeding. By its very nature, a Brady error results in an illegal suppression of material fact that could skew the jury's determinations, influence the trial court, and result in an erroneous appellate determination. What we must determine is whether this material reasonably might have resulted in a different outcome had it been properly disclosed under Brady.
The Brady material presented today directly reflects on the relative level of culpability between the two co-perpetrators, because it tends to establish that Kondian bore the greater guilt. Had this material been available for trial, the defense then could have argued the disparity to the jury. If believed, such evidence could have changed the jury's recommendation from 7-to-5 in favor of death to a 6-to-6 split, which constitutes a life recommendation under Florida law. In sum, a vote change by a single juror would have altered the entire complexion of this case, because the trial judge is required to give the jury's recommendation great weight. Tedder v. State, 322 So.2d 908 (Fla. 1975).
Moreover, the Brady material reasonably could have influenced this Court on appeal to *1133 reduce death to life because of Kondian's lesser sentence and his greater guilt (assuming arguendo the allegations here are true). We repeatedly have reduced sentences to life where a co-perpetrator of equal or greater culpability has received life or less. E.g., Harmon. Indeed, we have not hesitated to apply this standard even in collateral challenges long after the trial and direct appeals have ended, Scott v. Dugger, 604 So.2d 465 (Fla. 1992), as Mr. Scott now asks us to do. Accord Garcia v. State, 622 So.2d 1325 (Fla. 1993).
This conclusion is all the more compelling in light of the Florida Constitution's requirement that the death penalty be administered proportionately. Article I, section 17 of the Constitution prohibits the imposition of "unusual" punishments, and in examining this prohibition we previously have stated:
It clearly is "unusual" to impose death based on facts similar to those in cases in which death previously was deemed improper.
Tillman v. State, 591 So.2d 167, 169 (Fla. 1991).
I can think of no more paradigmatic example of disproportionate penalties than a case in which two persons have participated in the same murder yet the more culpable co-perpetrator is a free man and the less culpable co-perpetrator is sitting on death row. If that in fact is the case here, then the alleged Brady violation in this case has led to a result directly contrary to article I, section 17 of the Florida Constitution, because Scott's sentence thereby would be rendered "unusual." This is a question that must be examined on remand.
I emphasize that our task here in this proceeding is not to weigh the merits of Mr. Scott's Brady claim. That is the trial court's role once we determine that the claim, if true, would reasonably require relief. Because I believe Mr. Scott's pleadings meet this test, I concur with the majority opinion.
ANSTEAD, J., concurs.
GRIMES, Chief Justice, dissenting.
It is clear that Scott and Kondian planned to rob and kill Alessi and that Scott participated in the beating of Alessi and helped tie him up. Therefore, even if the evidence reflected by the statements of Coffin and Dixon and the medical examiner's photograph had been available to the defense, it would not have exonerated Scott from felony murder, and I cannot say that he would probably have received a life sentence.
OVERTON and WELLS, JJ., concur.
OVERTON, Justice, dissenting.
In the initial appeal on the merits of this case, I noted that this Court did not properly address the disparity of the sentences imposed on Scott and his codefendant, Richard Kondian. Scott v. State, 419 So.2d 1058, 1058 (Fla. 1982) (on rehearing) (Overton, J., dissenting). That issue has been subsequently addressed and rejected by this and other courts in the multiple proceedings in this case.
I dissent to this majority decision because I find no violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). With regard to this Brady claim, I note that the United States Supreme Court has stated that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972). The doctrine set forth in the Brady decision requires the prosecutor to disclose material exculpatory information in the prosecutor's possession. However, as stated by the United States Supreme Court in United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976), "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." The Court further stated: "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." Id. at 109-10, 96 S.Ct. at 2400. In Perry v. State, 395 So.2d 170 (Fla. 1980), this Court addressed a claim of failure to disclose all of *1134 the investigative reports for all defendants charged with related criminal offenses and found that neither Brady nor our rules of criminal procedure require disclosure of every conceivable investigative report. We stated:
To grant the request of the appellant under the circumstances of this record would require the police to produce all their investigative reports for all defendants charged with criminal offenses. We reject this contention and find that neither the federal constitution, the Brady doctrine, Florida criminal rules pertaining to discovery, nor the Florida statutes mandate disclosure or in camera inspection of these police investigative reports. Disclosure requirements for the prosecution principally concern those matters not accessible to the defense in the course of reasonably diligent preparation.
Id. at 174. I note that, under Rule of Criminal Procedure 3.220(a), Scott had the ability to discover all relevant information and, frankly, was able to discover much more than would be available in most other jurisdictions, including the federal courts. This Court has previously stated that, with the broad discovery rules that we have granted to a defendant goes the responsibility for the defendant to diligently utilize them. Furthermore, it appears that Scott's counsel has been aware of Coffin and the substance of his statement for several years. In Scott's own pleadings, counsel refers to the disclosure of Coffin's name in 1986 by the investigating detective in a deposition given to Kondian's counsel. Dixon was not unknown to Scott either because he traveled with Scott and Kondian from Florida to California after the murder. After examining the alleged new statements presented by Scott in this present 3.850 motion, I find that they do not exonerate Scott from his own culpability in this murder. Coffin's statement does not even mention Scott. I conclude that, even if the statements by Coffin and Dixon were newly discovered and taken as true, nothing in the statements would tend to exonerate Scott from felony murder for his participation in this incident. I note further that, after the trial of this cause on the merits, Scott, in his testimony to the Florida Probation and Parole Commission, acknowledged that he went to the victim's house with the intent to rob him; that he broke a vase over the victim's head and smashed a chair across his back; and that he tied the victim to a chair. While he did state that he had no intent to kill the victim, this is not a statement of non-participation. While I am still concerned that this Court has never addressed the merits of Scott's claim of the disparate sentences imposed on him and Kondian, the issue is procedurally barred and can no longer be addressed.
NOTES
[1] Scott raises the following issues before this Court in the appeal of the denial of his present rule 3.850 motion: claim 1 (Scott was denied his rights when exculpatory evidence was withheld by the State in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)); claim 2 (the State deliberately used false and misleading testimony and intentionally withheld exculpatory evidence); claim 3 (Scott is innocent); claim 4 (Scott is mentally retarded and his execution would constitute cruel and unusual punishment); claim 5 (Scott is precluded from advancing meritorious claims by arbitrarily applied procedural rules); claim 6 (the State is suppressing evidence and refusing to disclose records under chapter 119, Florida Statutes (1993)).
[2] Scott raises the following claim in his present petition for habeas corpus before this Court: Florida's statute setting forth the aggravating circumstances is vague and overbroad.
[3] We do not pass on Scott's public records claim because this can be further addressed by the trial court. We find the remainder of Scott's rule 3.850 claims procedurally barred, as is his habeas claim.