# Supreme Court of Florida

_____

No. SC18-1247
_____

**JOSE ANTONIO JIMENEZ,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC18-1321
_____

**JOSE ANTONIO JIMENEZ,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 4, 2018

PER CURIAM.

Jose Antonio Jimenez, a prisoner under sentence of death and an active

death warrant, has filed two appeals in this Court since Governor Scott signed his

death warrant on July 18, 2018. Collectively, Jimenez appeals the postconviction

court's orders summarily denying his fifth and sixth successive motions for postconviction relief filed under Florida Rule of Criminal Procedure 3.851, the postconviction court's order denying his motion to amend his sixth successive postconviction motion, and the postconviction court's order denying his motion to correct illegal sentence filed under Florida Rule of Criminal Procedure 3.800(a). We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons below, we affirm the denials of all four motions and lift the stay of execution entered on August 10, 2018.

## BACKGROUND

On October 2, 1992, Jimenez beat and stabbed to death 63-year-old Phyllis Minas in her home in Dade County, Florida. *Jimenez v. State*, 703 So. 2d 437, 438 (Fla. 1997), *cert. denied*, 523 U.S. 1123 (1998). Jimenez's jury found him guilty of burglary with an assault and battery in an occupied dwelling and first-degree murder, and he was subsequently sentenced to death for the murder consistent with his penalty phase jury's unanimous recommendation. *Id.* We previously described the facts of the incident as follows:

> During the attack [Minas's] neighbors heard her cry, "Oh God! Oh my God!" and tried to enter her apartment through the unlocked front door. Jimenez slammed the door shut, locked the locks on the door, and fled the apartment by exiting onto the bedroom balcony, crossing over to a neighbor's balcony and then dropping to the ground. Rescue workers arrived several minutes after Jimenez inflicted the wounds, and Minas was still alive. After changing his clothes and cleaning

himself up, Jimenez spoke to neighbors in the hallway and asked one of them if he could use her telephone to call a cab.

Jimenez's fingerprint matched the one lifted from the interior surface of the front door to Minas's apartment, and the police arrested him three days later at his parents' home in Miami Beach.

*Id.* We upheld Jimenez's convictions and sentence of death on direct appeal, and they became final in 1998 when the United States Supreme Court denied certiorari. *Id.* at 442; *Jimenez v. Florida*, 523 U.S. 1123 (1998).

Since then, Jimenez has engaged in extensive litigation in both state and federal court, none of which has resulted in relief from his convictions or sentence of death. As relevant to the claims raised in these proceedings, in 2001, we upheld the denial of Jimenez's initial postconviction motion. *Jimenez v. State*, 810 So. 2d 511, 513 (Fla. 2001). Thereafter, we affirmed the denial of Jimenez's first successive postconviction motion, which Jimenez filed in April 2005. *Jimenez v. State*, 997 So. 2d 1056 (Fla. 2008). Additionally, Jimenez sought relief in federal court pursuant to a petition for writ of habeas corpus, the district court denied relief, and the Eleventh Circuit Court of Appeals denied Jimenez's request for a certificate of appealability. *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1340-41 (11th Cir.), *cert. denied*, 552 U.S. 1029 (2007).

Governor Scott signed Jimenez's death warrant on July 18, 2018.[1] Thereafter, Jimenez filed several requests for public records to numerous agencies, including a request for additional public records pursuant to Florida Rule of Criminal Procedure 3.852(h)(3) to the City of North Miami Police Department (NMPD), which was the agency that investigated the victim's murder and, three days later, arrested Jimenez. Collateral counsel had not "previously requested public records" from NMPD (or any other agency), which is a prerequisite for a request for additional records pursuant to rule 3.852(h)(3). *See* Fla. R. Crim. P. 3.852(h)(3); *see also Hannon v. State*, 228 So. 3d 505, 511 (Fla.), *cert. denied*, 138 S. Ct. 441 (2017). NMPD had, however, more than 18 years before Jimenez's post-warrant records request, submitted records to the repository pursuant to the provisions of rule 3.852(h) that apply to cases like Jimenez's, in which the mandate affirming the conviction and sentence of death was issued prior to rule 3.852's effective date of October 1, 1998. *See* Fla. R. Crim. P. 3.852(h)(1). Although NMPD objected to and the postconviction court ultimately denied Jimenez's public records request to NMPD, NMPD sent its entire, unredacted file to the repository as a courtesy before the postconviction court entered its denial order so that there could be a comparison between it and NMPD's prior submission. The repository

---

1. Jimenez's execution was scheduled for 27 days later, on August 14, 2018, but this Court subsequently stayed his execution.

received NMPD's submission on July 25, 2018, and on July 30, 2018, Jimenez obtained an order from the postconviction court allowing him to access those records, even though they had not been redacted, subject to a prohibition against releasing any confidential or exempt records without permission from the postconviction court. The records repository began emailing Jimenez's counsel the records that same day and also sent Jimenez's counsel a CD containing the records (over 1,000 pages), which was received the next day, July 31, 2018.

During the same time period that Jimenez was reviewing NMPD's post-warrant records submission, he was also litigating in the postconviction court his fifth successive postconviction motion and a motion to correct illegal sentence, both of which Jimenez filed after the Governor signed his death warrant. After holding a *Huff*[2] hearing, the postconviction court summarily denied Jimenez's fifth successive postconviction motion and denied his motion to correct illegal sentence on July 31, 2018. Jimenez appealed the denials to this Court on August 1, 2018.

On the same day, August 1, 2018, during their review of NMPD's post-warrant records submission, Jimenez's counsel and his investigator saw handwritten documents that they did not recognize. The investigator then traveled to the repository to compare the 2018 submission against NMPD's prior submission, and Jimenez's counsel ultimately confirmed that 81 pages of

2. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

- 5 -

handwritten records had not previously been disclosed. Jimenez's counsel further confirmed that there was no indication in NMPD's prior submission that records had been withheld or public records exemptions claimed.

On August 6, 2018, without first seeking leave from this Court's post-warrant scheduling order—which required all proceedings in the postconviction court to be completed by July 31, 2018—Jimenez filed in the postconviction court his sixth successive postconviction motion raising one claim with several subclaims in which he argued that NMPD's post-warrant records submission includes newly discovered evidence that demonstrates *Brady*,[3] *Giglio*,[4] due process, and discovery violations that singularly and cumulatively entitle him to relief from his convictions and death sentence or, at minimum, an evidentiary hearing. After the postconviction court held a *Huff* hearing, Jimenez sought to amend his sixth successive postconviction motion to add a new subclaim as well as additional allegations regarding other of his subclaims. On August 9, 2018, the postconviction court denied Jimenez's motion to amend and summarily denied his sixth successive postconviction motion, stating in both denial orders that it would not entertain rehearing.

---

3. *Brady v. Maryland*, 373 U.S. 83 (1963).

4. *Giglio v. United States*, 405 U.S. 150 (1972).

On August 10, 2018, Jimenez appealed to this Court the summary denial of his sixth successive postconviction motion and the denial of his motion to amend. Thereafter, we stayed Jimenez's execution and amended *nunc pro tunc* the July 31, 2018, deadline for completing proceedings before the postconviction court to the date that they had actually been completed, August 10, 2018. In so doing, we prohibited additional filings in the postconviction court by either party without prior leave of this Court.

Presently pending before this Court are (1) Jimenez's first post-warrant appeal, in which Jimenez challenges the summary denial of his fifth successive postconviction motion and the denial of his motion to correct illegal sentence; and (2) Jimenez's second post-warrant appeal, in which Jimenez challenges the summary denial of his sixth successive postconviction motion and the denial of his motion to amend. We address them in turn.

## ANALYSIS

### I. First Post-Warrant Appeal

### A. Fifth Successive Postconviction Motion

In appealing the summary denial of his fifth successive postconviction motion, Jimenez raises four claims: (1) that he was denied access to public records necessary and relevant to framing and prosecuting his postconviction claims; (2) that he is entitled to an evidentiary hearing on his claim that Florida's use of

etomidate as the first of three drugs in its lethal injection procedure places him at substantial risk of serious harm in violation of the Eighth Amendment and article I, section 17 of the Florida Constitution; (3) that Florida's continued use of a three-drug protocol instead of a one-drug protocol constitutes cruel and unusual punishment in light of evolving standards of decency; and (4) that executing him after he has spent more than 23 years on death row constitutes cruel and unusual punishment in light of evolving standards of decency. None of these claims warrants relief.

**(1) Public Records**

Jimenez first challenges the postconviction court's denial of his requests for certain public records pursuant to Florida Rule of Criminal Procedure 3.852(h)(3) and (i),[5] which he claims are necessary and relevant to framing and prosecuting his

---

5. "[R]ecords requests under Rule 3.852(h) are limited to persons and agencies who were the recipients of a public records request at the time the defendant began his or her postconviction odyssey; whereas, records requests under Rule 3.852(i) must show how the requested records relate to a colorable claim for postconviction relief and good cause as to why the public records request was not made until after the death warrant was signed." *Hannon*, 228 So. 3d at 511 (internal quotation marks and citation omitted); *see also* Fla. R. Crim. P. 3.852(i)(2)(C) (listing as one condition of the trial court's ordering the production of additional public records that "the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence"); Fla. R. Crim. P. 3.852(k)(1) (limiting the scope of production "under any part of this rule," in pertinent part, to public records that are "either relevant to the subject matter of the proceeding under rule 3.851 or are reasonably calculated to lead to the discovery of admissible evidence").

postconviction claims. "We review rulings on public records requests pursuant to Florida Rule of Criminal Procedure 3.852 for abuse of discretion," *Hannon*, 228 So. 3d at 511, and find none here.

Jimenez first argues that the postconviction court erred by denying his rule 3.852(h)(3) request to the Florida Department of Corrections (DOC) on the ground that "the records are overbroad, burdensome, and not related to a colorable claim."[6] Jimenez relies on this Court's decision in *Muhammad v. State*, 132 So. 3d 176, 201 (Fla. 2013), for the proposition that it is an abuse of discretion to deny an inmate "his own inmate and medical records." However, unlike Muhammad's counsel, who "had made previous requests for these records from the DOC, and [following the signing of Muhammad's death warrant] sought an update of his inmate and medical files," *id.*, Jimenez's collateral counsel had not previously requested public records from DOC as required by the plain language of rule 3.852(h)(3).

---

6. Jimenez's request to DOC states, in pertinent part, that

[t]he public records requested are for any files, records, reports, letters, memoranda, notes, drafts and/or electronic mail in the possession or control of [DOC] pertaining to Mr. Jimenez that were received or produced by [DOC] since Mr. Jimenez's previous request; and or any documents that were, for any reason, not produced previously.

Collateral counsel does not deny the absence of a prior records request to DOC. Rather, he argues that rule 3.852 relieved him of that obligation because it established the records repository. However, this argument is contrary to the plain language of rule 3.852(h)(3), which limits the request for production of additional public records under that subdivision to "a person or agency from which collateral counsel has previously requested public records." Fla. R. Crim. P. 3.852(h)(3); *see also Rolling v. State*, 944 So. 2d 176, 181 (Fla. 2006) ("Because there is no evidence in the record that Rolling has ever requested records from the Medical Examiner's Office or the Department of Corrections before his [post-warrant request], we find that the trial court was correct in denying his claim without an evidentiary hearing."); *Sims v. State*, 753 So. 2d 66, 70 (Fla. 2000) ("The use [in rule 3.852(h)(3)] of the past tense and such words and phrases as 'requested,' 'previously,' 'received,' 'produced,' 'previous request,' and 'produced previously' are not happenstance.").

Moreover, unlike the public records request at issue in *Muhammad*, Jimenez's request to DOC did not specifically identify the records requested, or provide any context as to how those records were relevant to a potential, colorable claim. *Cf. Muhammad*, 132 So. 3d at 201 (affirming the denial of "overly broad" requests under rule 3.852(h)(3) that "did not clearly demonstrate how the records were relevant to a colorable claim"). The record nevertheless shows that DOC

produced, as a courtesy, Jimenez's medical and psychological records, which had previously been produced to different counsel in 2015 in connection with Jimenez's clemency proceedings. While Jimenez argues that his inmate file might reveal a basis to challenge his competency to be executed, even though Jimenez acknowledged receipt of his medical and psychological records in the fifth successive postconviction motion at issue, he did not allege that claim. Nor has he explained how his inmate file would be relevant to the claims he did raise in his motion, or the claims he subsequently raised in his sixth successive postconviction motion discussed below. *Cf. Sims*, 753 So. 2d at 69 (explaining that rule 3.852 "is a discovery rule for public records production ancillary to proceedings pursuant to rules 3.850 and 3.851").

On these facts, holding that the postconviction court abused its discretion in denying Jimenez's eleventh-hour request would be antithetical to the purpose of rule 3.852(h)(3). *See id.* at 70 (explaining that rule 3.852(h)(3) is "not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief" but rather "provide[s] for the production of public records from persons and agencies who were the recipients of a public records request at the time the defendant began his or her postconviction odyssey"). Accordingly, we affirm the postconviction court's denial of Jimenez's request to DOC pursuant to rule 3.852(h)(3).

We also find no abuse of discretion in the postconviction court's denial of requests for additional records from DOC, the Florida Department of Law Enforcement (FDLE), and the District Eight Medical Examiner pursuant to rule 3.852(i), which Jimenez requested in support of his challenges to Florida's current lethal injection protocol. Specifically, although the postconviction court ordered DOC and FDLE to produce checklists, logs, and documents memorializing the execution of Eric Branch, Jimenez claims that the postconviction court erred by denying his requests for records related to the selection of drugs, creation of the protocol, alternatives to the current protocol, reasons for the recent changes that have been made, including to the positioning of inmates in the death chamber and the mitten-like coverings that are placed on their hands, and the records of three other executions besides Branch's using the current protocol (Mark James Asay, Cary Michael Lambrix, and Patrick Hannon).

Recently, in finding no abuse of discretion in the denial of a similar request, we explained that "[t]he current injection protocol was fully considered and approved of in *Asay VI*,"[7] and "production of records relating to lethal injection are 'unlikely to lead to a colorable claim for relief [when] the challenge to the constitutionality of lethal injection as currently administered in Florida has been fully considered and rejected by the Court.' " *Hannon*, 228 So. 3d at 511-12

---

7. *Asay v. State (Asay VI)*, 224 So. 3d 695 (Fla. 2017).

(quoting *Walton v. State*, 3 So. 3d 1000, 1014 (Fla. 2009)); *see also Correll v. State*, 184 So. 3d 478, 492 (Fla. 2015) (holding public records request "for the autopsy records of *twenty-one* inmates is not only unduly burdensome, but also unlikely to lead to a colorable claim because the records would not establish when the inmates became unconscious, or whether they experienced pain during their executions"); *Muhammad*, 132 So. 3d at 203 ("[R]equests related to actions of lethal injection personnel in past executions do not relate to a colorable claim concerning future executions because there is a presumption that members of the executive branch will perform their duties properly."). We likewise find no abuse of discretion here.

### (2) Use of Etomidate

Jimenez next argues that the postconviction court erred in summarily denying his claim that Florida's use of etomidate as the first of three drugs in its lethal injection procedure places him at substantial risk of serious harm in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the Florida Constitution. We disagree.

Claims raised under rule 3.851 " 'may be summarily denied when they are legally insufficient . . . or are positively refuted by the record.' Because a postconviction court's decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is

- 13 -

tantamount to a pure question of law, subject to de novo review." *Marek v. State*, 8 So. 3d 1123, 1127 (Fla. 2009) (quoting *Connor v. State*, 979 So. 2d 852, 868 (Fla. 2007)).  Further, "[c]onclusory and speculative allegations are insufficient to warrant an [e]videntiary [h]earing." *Knight v. State*, 923 So. 2d 387, 399 (Fla. 2005) (quoting order denying amended motion for postconviction relief).

In *Asay VI*, we fully considered and approved of the current lethal injection procedure, which replaced midazolam with etomidate as the first drug in the three-drug protocol.  In so doing, we held that competent, substantial evidence supported the postconviction court's finding after an evidentiary hearing that Asay had failed to make the showing required to prevail on a method of execution challenge under the Eighth Amendment pursuant to the United States Supreme Court's decision in *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015).  *Asay VI*, 224 So. 3d at 701 ("In *Glossip*, the Supreme Court provided that a condemned prisoner must: (1) establish that the method of execution presents a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering and (2) identify a known and available alternative method of execution that entails a significantly less severe risk of pain.").

Jimenez argues that events that transpired during Eric Branch's February 2018 execution constitute new evidence requiring reconsideration of the

- 14 -

constitutionality of lethal injection as currently administered in Florida.[8]

Specifically, Jimenez argues that screaming and body movements during Branch's execution show that Jimenez will experience severe pain on injection of the first drug in the protocol—etomidate—and that etomidate may not render Jimenez fully unconscious for the entire period of the execution, thereby placing him at substantial risk of serious harm.

However, it is impossible to know whether Branch's actions were in protest of his execution or a reaction to etomidate, such as the "transient venous pain on injection and transient skeletal movements, including myoclonus" recognized among the "most frequent adverse reactions" in *Asay VI*, 224 So. 3d at 701. Moreover, the record indicates that the required consciousness check was performed before the subsequent administration of the second and third drugs.

---

8. In its order summarily denying relief on this claim, the postconviction court explained the relevant facts from Branch's execution:

> Shortly before the execution process began, Branch gave a statement calling Governor Rick Scott and Attorney General Bondi "cowards" for failing to execute him in person. As the administration of the etomidate commenced, Branch released a guttural yell or scream. He then yelled out "murderers" three times. Branch's legs were moving, his head moved, and his body was shaking. He calmed down within a minute. The appropriate consciousness check was performed before the subsequent administration of the second and third drugs.

In sum, Jimenez's speculative and conclusory allegations regarding Branch's execution are insufficient to require revisiting our holding in *Asay VI* approving the constitutionality of lethal injection as currently administered in Florida over the challenge that the use of etomidate as the first drug in the lethal injection protocol presents a substantial risk of serious harm.[9] *Cf. Hannon*, 228 So. 3d at 508-09 (affirming postconviction court's summary denial of challenge to constitutionality of the current lethal injection protocol approved in *Asay VI* where "Hannon presented no new evidence that would require us to reconsider our recent approval of the three-drug protocol").

### (3) Three-Drug Protocol

Jimenez next argues that Florida's continued use of a three-drug protocol instead of a one-drug protocol constitutes cruel and unusual punishment in light of evolving standards of decency. However, "we have consistently rejected [the]

---

9. Jimenez could not prevail on his challenge to the current protocol in any event because he has also failed to meet his burden under *Glossip* to "identify a known and available alternative method of execution that entails a significantly less severe risk of pain." *Asay VI*, 224 So. 3d at 701 (citing *Glossip*, 135 S. Ct. at 2737). His proposed alternative—replacing the three-drug protocol with one drug, pentobarbital or compounded pentobarbital—relies on a drug that is not readily available and has been previously rejected by this Court as speculative. *See id.* at 702. To the extent Jimenez suggests switching back to midazolam, this Court rejected the argument that the substitution of etomidate for midazolam violates the Eighth Amendment in *Asay VI*. Finally, although Jimenez proposes switching from lethal injection to nitrogen gas, his fifth successive postconviction motion states that he "has not had adequate time to research and consult with an expert about this method."

challenge that the DOC should substitute the current three-drug protocol with a one-drug protocol." *Hannon*, 228 So. 3d at 509 (citing *Asay VI*, 224 So. 3d at 702; *Muhammad*, 132 So. 3d at 196-97); *see also Muhammad*, 132 So. 3d at 197 ("Florida is not obligated to adopt an alternative method of execution without a determination that Florida's current three-drug protocol is unconstitutional."). Accordingly, the postconviction court properly denied this claim.

### (4) Length of Time on Death Row

In his final claim in the appeal of the denial of his fifth successive postconviction motion, Jimenez argues that, because he has spent over 23 years on death row, adding his execution to that punishment constitutes cruel and unusual punishment in light of evolving standards of decency. We have consistently rejected this argument and decline to recede from our long-standing precedent in Jimenez's case. *See, e.g.*, *Lambrix v. State*, 217 So. 3d 977, 988 (Fla.), *cert. denied*, 138 S. Ct. 312 (2017) (denying relief on claim "that the totality of the punishment the State has imposed on [the capital defendant], which now includes not just execution, but also more than three decades of being on death row, violates the Eighth Amendment" and citing numerous cases demonstrating that "[t]his Court has consistently rejected this claim"). Accordingly, we affirm the postconviction court's denial of relief on this claim.

## B. Motion to Correct Illegal Sentence

Jimenez also appeals the postconviction court's denial of his rule 3.800(a) motion to correct illegal sentence.[10] Jimenez argues that his life sentence for burglary with an assault and battery in an occupied dwelling is illegal in light of this Court's decision in *Delgado v. State*, 776 So. 2d 233 (Fla. 2000), in which this Court receded from the interpretation of the burglary statute that it had used to affirm Jimenez's burglary conviction on direct appeal. We previously denied Jimenez relief pursuant to *Delgado* in affirming the denial of his initial postconviction motion, *see Jimenez*, 810 So. 2d at 512-13, and we reject his attempt to misuse rule 3.800(a) to revive arguments that are procedurally barred. *See also Jimenez*, 481 F.3d at 1340, 1340, 1342-43 (denying Jimenez's application for a certificate of appealability to appeal the district court's denial of his federal habeas claim that this Court's "refusal on collateral review to apply a subsequent construction of the burglary statute to the conduct for which Jimenez was convicted violated due process and the Eighth Amendment prohibition against the arbitrary and capricious imposition of a death sentence" because the claim was

---

10. The standard of review is de novo. *See Williams v. State*, 235 So. 3d 962, 963 (Fla. 5th DCA 2017) ("The error to be corrected in a rule 3.800(a) motion must be apparent from the face of the record. *Johnson v. State*, 60 So. 3d 1045, 1049 (Fla. 2011). Accordingly, such a motion cannot require an evidentiary hearing. *Id.* As no evidentiary hearing is required or permitted, this Court is presented with pure issues of law on appeal, and applies the de novo standard of review.").

procedurally barred and because, even without the procedural bar, "Jimenez did not make a substantial showing that [this Court's] refusal to apply retroactively an interpretation of the burglary statute violated his constitutional rights"). Accordingly, we affirm the postconviction court's denial of relief.

## II. Second Post-Warrant Appeal

Jimenez's second post-warrant appeal challenges the postconviction court's summary denial of his sixth successive postconviction motion, in which Jimenez raised claims of *Brady*, *Giglio*, discovery, and due process violations arising from alleged newly discovered evidence contained within 81 pages of investigatory and trial preparation materials recently disclosed by NMPD. In addition, Jimenez appeals the postconviction court's denial of his motion to amend his sixth successive postconviction motion to add a new subclaim and additional argument regarding other of his subclaims. We address the motion to amend first, followed by the sixth successive postconviction motion.

### A. Motion to Amend

"[E]ven accepting for the sake of argument that the circuit court erred in denying the motion [to amend], any such error would clearly be harmless." *Zakrzewski v. State*, No. SC11-1896, 115 So. 3d 1004 (Fla. Nov. 9, 2012) (table). Jimenez's claims are based upon written materials contained in NMPD's post-warrant records submission that "this Court is just as capable as the trial court of

- 19 -

assessing." *Johnson v. State*, 44 So. 3d 51, 72 n.18 (Fla. 2010). As explained below, even giving Jimenez the benefit of his proposed amendments, none of his claims warrants relief. Accordingly, we affirm the denial of Jimenez's motion to amend and find no error in the postconviction court's refusal to allow rehearing for claims that are conclusively refuted by the record and, thus, due to be summarily denied.

## B. Sixth Successive Postconviction Motion

Jimenez next appeals the postconviction court's summary denial of his sixth successive postconviction motion. Giving Jimenez the benefit of the additional subclaim and arguments presented in his motion to amend, Jimenez raises the following seven subclaims, which he alleges arise from records that were previously undisclosed by NMPD: (1) handwritten detective notes of an interview with Jimenez's and the victim's neighbor that occurred before the neighbor gave her sworn, recorded statement evince a *Brady* violation; (2) handwritten detective notes from an interview with Jimenez's former girlfriend regarding her daughter's relationship with the victim evince a *Brady* violation; (3) handwritten notes by NMPD Detectives Diecidue and Ojeda taken during their interview with Jimenez on the day of his arrest evince *Brady*, *Giglio*, discovery, and due process violations; (4) handwritten detective notes regarding, and correspondence from, jailhouse informant Jeffrey Allen evince a *Brady* violation; (5) a fax coversheet

- 20 -

showing communication between NMPD and private investigator Steve Sessler on October 16, 1992, evince a *Brady* violation; (6) handwritten detective notes showing contact information for cab driver Anwar Ali and the content of a September 1993 interview with Ali evince a *Brady* violation; and (7) handwritten notes that appear to be trial preparation materials for Detective Ojeda evince a *Brady* violation.  Jimenez contends that, singularly and cumulatively, these alleged violations entitle him to relief from his convictions and sentence of death, or at the very least require an evidentiary hearing.

Before analyzing each of Jimenez's subclaims, we address the standards that govern our review.

## Timeliness

Before this Court may reach the merits of any subclaim within Jimenez's sixth successive postconviction, he must first establish that it is timely.  A rule 3.851 motion for postconviction relief must generally be filed within one year after the judgment and sentence are finalized.  *See* Fla. R. Crim. P. 3.851(d)(1).  A motion filed after the expiration of this time period is procedurally barred unless one of the following circumstances exists:

> (A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or
> (B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or

(C) postconviction counsel, through neglect, failed to file the motion.

Fla. R. Crim. P. 3.851(d)(2).

Jimenez filed the sixth successive rule 3.851 motion at issue on August 6, 2018, well beyond the one-year time period limitation after his judgment and sentence became final on May 18, 1998, when the United States Supreme Court denied certiorari. However, Jimenez argues that his motion is timely under rule 3.851 because the 81 pages of investigatory and trial preparation materials that NMPD disclosed in response to Jimenez's post-warrant public records request constitute newly discovered evidence. "To be considered timely filed as newly discovered evidence, the rule 3.851 motion was required to have been filed within one year of the date upon which the claim became discoverable through due diligence." *Jimenez*, 997 So. 2d at 1064 (citing *Mills v. State*, 684 So. 2d 801, 804-05 (Fla. 1996)).

If Jimenez is correct that the claims in his sixth successive postconviction motion do, in fact, arise from newly discovered evidence (which, as addressed below, they do not) and are, therefore, timely (which, as addressed below, they are not), several standards nevertheless stand between Jimenez and the relief he seeks.

### ***Brady***

The first standard at issue in this appeal applies to Jimenez's claims that information contained in NMPD's 2018 post-warrant disclosure shows violations

of *Brady v. Maryland*, 373 U.S. 83 (1963), as well as the State's discovery obligations under the Florida Rules of Criminal Procedure. *Brady* requires the State "to disclose material information within its possession or control that is favorable to the defense." *Taylor v. State*, 62 So. 3d 1101, 1114 (Fla. 2011). To establish a *Brady* claim,

> the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Way v. State*, 760 So. 2d 903, 910 (Fla. 2000). To meet the materiality prong, the defendant must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Way*, 760 So. 2d at 913 (quoting *United States v. Bagley*, 473 U.S. [667,] 682 [(1985))]. A reasonable probability is a probability sufficient to undermine this Court's confidence in the outcome. *Id.*; *see also Strickler*, 527 U.S. at 290. However, in making this determination, a court cannot "simply discount[] the inculpatory evidence in light of the undisclosed evidence and determin[e] if the remaining evidence is sufficient." *Franqui v. State*, 59 So. 3d 82, 102 (Fla. 2011). "It is the net effect of the evidence that must be assessed." *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998).

*Mosley v. State*, 209 So. 3d 1248, 1258-59 (Fla. 2016) (quoting *Mungin v. State*, 79 So. 3d 726, 734 (Fla. 2011)).

Furthermore, to assess materiality where more than one *Brady* violation is alleged, pursuant to *Kyles v. Whitley*, 514 U.S. 419 (1995),

> [i]n making the materiality determination, a court must first "evaluate the tendency and force of the undisclosed evidence item by item" before separately "evaluat[ing] its cumulative effect." *See* [*Kyles*, 514 U.S.] at 436 n.10 ("We evaluate the tendency and force of

- 23 -

the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion . . . .”). “Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial.” *Smith* [*v. Sec'y, Dep't of Corr.*], 572 F.3d [1327,] 1334 [(11th Cir. 2009)]. “A ‘reasonable probability’ of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict.” *Id.* (citing *Kyles*, 514 U.S. at 434, 436 & n.10, 437).

*Smith v. State*, 235 So. 3d 265, 269 (Fla. 2017).

Jimenez also makes the related argument that the *Brady* violations he claims are reflected in NMPD's post-warrant disclosure show that the State failed to comply with its discovery obligations. As this Court has explained, “when discovery violations are proven in motions for postconviction relief[,] . . . [t]he test for measuring the effect of the failure to disclose exculpatory evidence, regardless of whether such failure constitutes a discovery violation, is [the same that applies to a *Brady* violation, namely] whether there is a reasonable probability that ‘had the evidence been disclosed to the defense, the result of the proceeding would have been different.’ ” *Duest v. Dugger*, 555 So. 2d 849, 851 (Fla. 1990) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Moreover, the defendant's “personal knowledge” of the evidence claimed to represent a *Brady* violation “would in and of itself defeat his *Brady* claim, since by definition such evidence would not have been unlawfully ‘suppressed’ by the State.” *Gorham v. State*, 494 So. 2d 211, 212 n.* (Fla. 1986).

- 24 -

## *Giglio*

The next standard at issue applies to Jimenez's claim that the State violated

*Giglio v. United States*, 405 U.S. 150 (1972). "By contrast to an allegation of

suppression of evidence under *Brady*, a *Giglio* claim is based on the prosecutor's

knowing presentation at trial of false testimony against the defendant." *Guzman v.*

*State*, 868 So. 2d 498, 506 (Fla. 2003). To establish a *Giglio* violation,

> "[A] defendant must show that: (1) the prosecutor presented or failed
> to correct false testimony; (2) the prosecutor knew the testimony was
> false; and (3) the false evidence was material." *Rhodes v. State*, 986
> So. 2d 501, 508-09 (Fla. 2008). As to the knowledge prong, in
> *Guzman . . . ,* [this Court has] clarified that *Giglio* is satisfied where
> the lead detective testifies falsely at trial because the "knowledge of
> the detective . . . is imputed to the prosecutor who tried the case." *Id.*
> at 505.
>     The materiality prong of *Giglio* is more defense-friendly than in
> a *Brady* claim. *See Davis v. State*, 26 So. 3d 519, 532 (Fla. 2009)
> ("[T]he standard applied under the third prong of the *Giglio* test is
> more defense friendly than the test . . . applied to a violation under
> *Brady*."). While under *Brady*, evidence is material if a defendant can
> show "a reasonable *probability* that . . . the *result* . . . would have been
> different," *Way*, 760 So. 2d at 913 (emphasis added), under *Giglio*, the
> evidence is considered material simply "if there is any reasonable
> *possibility* that it could have *affected* the jury's verdict." *Rhodes*, 986
> So. 2d at 509 (emphasis added).

*Mosley*, 209 So. 3d at 1259 (quoting *Mungin*, 79 So. 3d at 738).

Further, the cumulative analysis used to evaluate materiality under the *Brady*

standard also applies to *Giglio* claims. *See Smith v. Sec'y, Dep't of Corr.*, 572 F.3d

1327, 1334 (11th Cir. 2009) ("Considering the undisclosed evidence cumulatively

means adding up the force of it all and weighing it against the totality of the

evidence that was introduced at the trial.  That is the way a court decides if its confidence in the guilty verdict is undermined where a suppressed-evidence type of *Brady* claim is involved, or if the suppression was harmless beyond a reasonable doubt where a *Giglio* type of *Brady* claim is involved.").

And, similar to the way in which a defendant's personal knowledge of information allegedly "suppressed" is fatal to a *Brady* claim, *see Gorham*, 494 So. 2d at 212 n.*, a *Giglio* claim "based on information that the defendant and defense counsel had at the time of trial" is barred.  *Moore v. State*, 132 So. 3d 718, 724 (Fla. 2013).

### Due Process

Jimenez argues that the same new evidence within NMPD's post-warrant disclosure that he contends supports his *Brady* and *Giglio* claims also shows that the State violated his right to due process by misleading both his defense counsel and his jury.  *See Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957) (holding that it violates due process for a prosecutor to intentionally mislead the defense and jury in a material way).  In support of this argument, Jimenez relies primarily on *Garcia v. State*, 622 So. 2d 1325, 1331 (Fla. 1993), in which this Court explained that, "while the State is free to argue to the jury any theory of the crime that is reasonably supported by the evidence, it may not subvert the truth-seeking function of the trial by obtaining a conviction or sentence based on deliberate obfuscation of

relevant facts." *See also generally Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process. . . . Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation."); *Johnson v. State*, 44 So. 3d 51, 53 (Fla. 2010) ("[S]ociety's search for the truth is the polestar that guides all judicial inquiry, and when the State knowingly presents false testimony or misleading argument to the court, the State casts an impenetrable cloud over that polestar."); *Waterhouse v. State*, 82 So. 3d 84, 104 n.11 (Fla. 2012) ("[A]ttorneys and judges should be able to rely upon the veracity of a police report.").

However, as with the other due-process-based claims (i.e., *Brady* and *Giglio*), a defendant who knows that his jury is being misled cannot adopt an "I'll deal with it later" approach. *See* Fla. R. Crim. P. 3.851(d)(2); *cf. also Ferrell v. State*, 29 So. 3d 959, 977 (Fla. 2010) (holding claim that "the State violated *Giglio* when, during closing argument, the prosecutor misled the jury . . . actually presents a substantive claim of improper closing argument, which should have been raised on direct appeal, and is thus procedurally barred").

**Review of Summary Denial**

Finally, Jimenez's argument that the postconviction court should have granted him an evidentiary hearing implicates the standard applicable to our review

of a summary denial.  A postconviction motion may be summarily denied only "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief."  Fla. R. Crim. P. 3.851(f)(5)(B), (h)(6); *see also Parker v. State*, 904 So. 2d 370, 376 (Fla. 2005) ("As a general proposition, a defendant is entitled to an evidentiary hearing on any well-pled allegations in a motion for postconviction relief unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient.").  "Because a postconviction court's decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review."  *Marek v. State*, 8 So. 3d 1123, 1127 (Fla. 2009).  In reviewing a trial court's summary denial, "this Court must accept the defendant's allegations as true to the extent that they are not conclusively refuted by the record."  *Tompkins v. State*, 994 So. 2d 1072, 1081 (Fla. 2008).  However, mere conclusory allegations do not warrant an evidentiary hearing.  *Anderson v. State*, 220 So. 3d 1133, 1142 (Fla. 2017); *see also LeCroy v. Dugger*, 727 So. 2d 236, 238 (Fla. 1998) ("[S]peculation and conjecture about what . . . letters and notes and opinions and cryptic references *may* suggest is not sufficient to warrant an evidentiary hearing, much less relief.") (quoting trial court's order).

As explained below, application of these standards to Jimenez's subclaims makes clear that Jimenez is not entitled to relief on these claims.

**(1) Virginia Taranco, the neighbor**

In his first subclaim, Jimenez argues that the State committed a *Brady* violation when it failed to disclose information with respect to the victim's neighbor, Virginia Taranco, who provided a taped, sworn statement following the murder, was deposed prior to trial, and testified at trial. Jimenez claims that the previously undisclosed notes reveal "a previously unknown interview of Ms. Taranco before the taped statement began" during which Taranco exonerated Jimenez by "saying that while she was at Ms. Minas' door investigating the sounds that she had heard, she observed Mr. Jimenez come down from the third floor . . . while the assailant is still inside . . . [meaning that] Mr. Jimenez could not possibly have been the assailant." Contrary to Jimenez's assertion, the fact that this interview occurred was disclosed to Jimenez in discovery prior to trial, and the notes reveal that Taranco recounted the relevant facts in the preliminary interview exactly as she did in the taped interview, in her deposition, and at trial, which was not exonerating.

The notes start with five lines that have an "X" marked over them and are lined through. Those five lines, which form the basis for this subclaim, are plainly legible despite the cross-through, and read:

> Heard one bang, went to investigate
> Heard second bang. While at door
> observed [defendant] coming from Third Floor
> was wearing no hat First observed on
> ground Floor with baseball hat

The remainder of the detective's notes reflect that the detective had Taranco restart her account at the beginning, chronologically, from when she first observed Jimenez on the ground floor, prior to the murder, and describe Taranco seeing Jimenez coming down to the second floor (where the victim's apartment was located) from the third floor (where Jimenez's apartment was located) when Taranco was waiting for the police, not when she was at the victim's door hearing noises and seeing the victim's door being pushed shut from the inside.

This subclaim is procedurally barred, as this evidence is not newly discovered. The record establishes that Jimenez has known of the existence of Taranco's pre-interview since before trial because it was mentioned in her sworn taped statement—a transcript of which was provided to trial counsel in discovery and included in NMPD's original submission to the records repository more than 18 years before the successive postconviction motion at issue was filed.[11] Further

---

11. In the sworn taped statement of Taranco on October 7, 1992, Detective Ojeda states that he and Detective Diecidue spoke with Taranco immediately prior to beginning the taped interview. He said, "[W]e spoke to you natural before we went on tape and interviewed you. And we spoke to you about the homicide and what role you played in it on October 2nd."

underscoring Jimenez's knowledge that Taranco was interviewed before giving her sworn taped statement, defense counsel expressly referenced the pre-interview at trial during his cross-examination of Taranco. Although Jimenez claims that he was not aware that the page of handwritten notes existed, he was already aware of the information contained in the page of notes, as none of it is new or previously unknown information inconsistent with Taranco's sworn statement or her trial testimony.

Even if this subclaim were not procedurally barred, it is without merit. The first prong under *Brady* is not satisfied because this allegedly suppressed information is neither exculpatory nor impeaching. The crossed-out lines describe Taranco hearing two bangs, investigating the noises, standing at the victim's door, and two encounters with the defendant, without any mention of how much time passed between these events. These lines of notes do not reveal any facts that are inconsistent with the rest of the page of notes or with Taranco's trial testimony, which was that she saw Jimenez twice on the evening of the victim's murder. First, Taranco testified that she saw Jimenez in the parking lot at approximately 7:55 p.m. Second, Taranco testified that she saw Jimenez coming down the stairs to the second floor from the third floor somewhere between 8:20 and 8:22 p.m., after she had already called the police, which Taranco testified was at least 10 to 15 minutes after she heard the noises coming from inside the victim's apartment.

- 31 -

The crossed-out lines of the notes do not show that Jimenez was with Taranco at the victim's door while the attack was ongoing inside the victim's apartment, which would be exculpatory. Rather, these lines are almost identical to Taranco's trial testimony since hearing two bangs and observing Jimenez coming from the third floor while Taranco stood at the victim's door is consistent with the events and timeline articulated at trial.[12]

Accordingly, because this subclaim is both procedurally barred and without merit we affirm the postconviction court's summary denial.

**(2) Yvette Imhoff, Jimenez's former girlfriend**

Jimenez next argues that the State committed a *Brady* violation when it failed to disclose information with respect to a phone interview of Jimenez's former live-in girlfriend, Yvette Imhoff. The State allegedly failed to provide a page of handwritten notes from an October 7, 1992, telephonic interview between Detective Ojeda and Imhoff. The page of notes contains a sentence that states, "Phyllis became friends w/ daughter." Imhoff did not testify at trial, but the

---

12. Besides Detective Ojeda, Taranco is the only other person implicated by Jimenez's claims who testified at trial. Jimenez's frequent use of the phrase "*Giglio/Brady* claims" in his briefs filed in this Court, coupled with his argument that the notes from Taranco's pre-interview may be true while her trial testimony may not be, makes it unclear whether Jimenez is also arguing that the notes demonstrate that the State knowingly presented false testimony by Taranco in violation of *Giglio*. To the extent Jimenez is making this claim, because the notes do not show that Taranco's trial testimony was false, they do not evince a *Giglio* violation. *See Mosley*, 209 So. 3d at 1259.

- 32 -

written report by Detective Ojeda regarding his interview with Imhoff (which was previously disclosed) states that, in response to his question as to whether Jimenez or Imhoff ever knew the victim, Imhoff stated that she knew that her daughter had become friends with a lady downstairs, but that her daughter never mentioned her name. Jimenez claims that the sentence in the notes is newly discovered evidence that the person whom Imhoff's daughter became friends with was the victim and is *Brady* material because it is exculpatory. He asserts that the fact that the victim had a friendship with Jimenez's former girlfriend's daughter, and that Jimenez knew about it, shows that Jimenez had a positive relationship with the victim and that he had been inside her apartment on occasion—which explains his fingerprint on the inside of the victim's front door.

This subclaim is procedurally barred. Detective Ojeda's previously disclosed report expressly mentions the phone interview and the fact that Imhoff stated that her daughter had made friends with a lady downstairs. Moreover, Imhoff's statement was not without context, as Detective Ojeda's report plainly states that Imhoff gave this answer in response to his question of whether either she or Jimenez ever knew the victim. To the extent it is not clear from the context that the report's reference to a "lady downstairs" is in reference to the victim, with due diligence, Jimenez could have followed up years ago and discovered this information. In any event, if Jimenez had a good relationship with the victim and

- 33 -

had been inside the victim's apartment on previous occasions, this would not be newly discovered evidence because Jimenez would have known it all along. *Cf. Jimenez*, 997 So. 2d at 1068 (concluding that "[t]he presence of Jimenez inside [the victim's] unit on other occasions is necessarily based on his own personal knowledge of his actions," which is not "newly discovered evidence").

Even without the procedural bar, however, the subclaim is without merit. The first prong under *Brady* is not satisfied because this allegedly suppressed information is not exculpatory. The handwritten sentence relied upon by Jimenez does not provide any information regarding whether Jimenez actually knew that his former girlfriend's daughter had befriended the victim. Nor does it show that Jimenez had any relationship with the victim whatsoever, let alone a good relationship. Moreover, the sentence does not relate in any way to the allegation that Jimenez had been inside the victim's apartment on other occasions, prior to the victim's murder. Nor does the sentence have any impeachment value. Imhoff did not testify at trial. Moreover, Detective Ojeda did not testify regarding his interview with Imhoff. Nor is Detective Ojeda's report from Imhoff's interview, in which it was clear that he was asking Imhoff about any contact that she or Jimenez had with the victim, viewed through the lens of his notes, which expressly references the victim's name, impeaching in the sense that it shows NMPD's

investigation was not a search for the truth.  Accordingly, there was not a *Brady* violation.[13]  We affirm the postconviction court's summary denial of this subclaim.

**(3) Jimenez's Statements to Detectives Diecidue and Ojeda**

In his third subclaim, Jimenez argues that NMPD's post-warrant disclosure of notes taken by Detectives Diecidue and Ojeda during their interview of Jimenez on the day of his arrest establish *Brady*, *Giglio*, discovery, and due process violations that entitle him to relief from his convictions and sentence of death, or, minimally, to an evidentiary hearing.  This subclaim is procedurally barred and, in any event, without merit.

The notes at issue indicate that they were taken during an interview of Jimenez by Detective Diecidue at 2:50 p.m. on an unspecified date and during an interview of Jimenez by Detective Ojeda at 3:55 p.m. on an unspecified date,

---

13. In this subclaim, Jimenez points out that the notes regarding Imhoff's interview also contain the phrase "wh/van unk span/male."  However, beyond referencing this fact in a footnote in his motion below, Jimenez did not argue how this note entitles him to relief, and it is still not clear whether or how he contends it does.  Nevertheless, that Jimenez knew of the existence of and, thus, had the ability to follow up on the presence of a white van in connection with this case is clear from a review of the trial transcript.  A police officer (Officer Cardona) had been assigned to investigate a white van seen in the parking complex of the apartment near the victim's balcony, and, although this officer did not testify at trial, she wrote a report and gave a deposition about her investigation.  Further, at trial, testimony regarding a white van being parked under the victim's balcony ranged from witnesses who saw the van, witnesses who said they did not see it, and witnesses who were alleged to have made inconsistent statements as to whether they saw it or not.  This is not newly discovered evidence.

which Jimenez argues was October 5, 1992, as his arrest occurred at approximately 3:55 p.m. on that date. The notes suggest that Jimenez told Detective Diecidue that he knocked on the victim's door at approximately 7:00 p.m. on the evening of the murder to use her phone, but that she was using the phone, and that he later used a phone to call a cab at approximately 8:00 p.m., went downstairs to meet the cab, and saw the police. The notes also indicate that Jimenez talked to Detective Ojeda about the various residents of the apartment complex, telling him which residents lived in which apartments; disclosed that he had a "problem" with one of his neighbors (not the victim) because of "music"; and told Detective Ojeda what he was wearing on the day of the murder.[14]

Jimenez's claim is procedurally barred. The fact that these statements were made by Jimenez and the fact that the detectives took notes while Jimenez made them is not newly discovered evidence because Jimenez necessarily had personal knowledge of these facts and because the detectives generally disclosed the substance of the conversations that occurred prior to Jimenez invoking his rights

---

14. Detective Ojeda's notes also reference the time of 8:00 p.m., a cab, and "Vig," which Jimenez suggests is shorthand for "Virginia." Testimony at trial showed that Jimenez used his neighbor Virginia Taranco's phone to call a taxi after Taranco had called the police upon becoming concerned for the victim's welfare.

under *Miranda*.[15] *See* Fla. R. Crim. P. 3.851(d)(2); *cf. Jimenez*, 997 So. 2d at 1068.

Moreover, even without the procedural bar, Jimenez would not be entitled to relief on the merits. Although the record reveals that, despite being asked during their pre-trial depositions, both detectives failed to disclose the full content of Jimenez's statements to them (and also failed to document the full substance of those statements in their reports),[16] Jimenez has failed to establish *Brady*'s third prong of materiality. There is no reasonable probability that had the jury heard the information contained in the detectives' notes the result of the proceeding would have been different. Jimenez's cooperation or lack thereof was not a feature of the State's case, and the value of Jimenez's statements concerning his interaction with the victim is limited. They do not show a close relationship between Jimenez and the victim or put Jimenez inside the victim's apartment in a position to leave his fingerprint on the inside of the victim's front door at any time other than during the murder when witnesses testified that the door was pushed shut and locked from the

---

15. *Miranda v. Arizona*, 384 U.S. 436 (1966).

16. The applicable discovery rule did not require the State to provide the detectives' notes to Jimenez. *See* Fla. R. Crim. P. 3.220(b)(1)(B). However, because these notes show the substance of statements made orally by Jimenez, the defendant, the State did have a discovery obligation to reveal their contents, regardless of whether they constitute *Brady* material or evince a *Giglio* or other due-process violation. *See* Fla. R. Crim. P. 3.220(b)(1)(C).

inside around the same time as another witness identified Jimenez dropping down from a balcony beside the victim's balcony. Adding up the force of the information concerning Jimenez's alleged cooperation with law enforcement and his statements concerning innocent contact with the victim or her apartment and weighing it against the totality of the evidence that was introduced at the trial, there is no reasonable probability of a different outcome. Our confidence in the outcome is not undermined. *See Mosley*, 209 So. 3d at 1258-59.

Nor has Jimenez proven a *Giglio* or due process violation. In his initial brief, Jimenez contends that "the lies and misrepresentations by Detectives Ojeda and Diecidue in their pretrial deposition testimony and in their police reports violated due process and amounted to a *Giglio* violation" and demonstrate that the State obscured relevant facts in order to obtain his convictions and sentence. We disagree.

Jimenez's allegations of false testimony and misleading argument by the State implicate *Giglio*'s prohibition against the State's knowing presentation of false testimony, to the extent that false testimony was actually presented at trial. *See Jimenez*, 997 So. 2d at 1070 (explaining that "supposed false testimony" that is "not presented during the trial . . . cannot form the basis for a *Giglio* claim"). To the extent Jimenez's allegation that the State obscured the relevant facts to obtain his convictions and sentence are based on the State's arguments during his trial,

they implicate the due-process protection against the State's misleading the jury (or the court).  *See Ferrell*, 29 So. 3d at 977 (concluding that the claim that "the State violated *Giglio* when, during closing argument, the prosecutor misled the jury . . . actually presents a substantive claim of improper closing argument"); *see also Evans v. State*, 177 So. 3d 1219, 1234 (Fla. 2015) (explaining that a preserved challenge to the prosecutor's improper closing arguments is reviewed for harmless error); *Garcia*, 622 So. 2d at 1331 ("[W]hile the State is free to argue to the jury any theory of the crime that is reasonably supported by the evidence, it may not subvert the truth-seeking function of the trial by obtaining a conviction or sentence based on deliberate obfuscation of relevant facts.").  Regardless of how the claim is classified, however, assuming, as we do here, that there is no preservation issue or other procedural bar, entitlement to relief is measured by whether the knowing presentation of false testimony or misleading argument was harmless beyond a reasonable doubt.  *See Guzman*, 941 So. 2d at 1050 (explaining that "the test of materiality under *Giglio*. . . . is the same as the harmless error test," which "requires the State to prove that there is no reasonable possibility that the error contributed to the conviction") (internal quotation marks omitted); *see also Mosley*, 209 So. 3d at 1259 ("[U]nder *Giglio*, the evidence is considered material simply if there is any reasonable *possibility* that it could have *affected* the jury's verdict.") (internal quotation marks omitted).

Here, while the detectives only revealed that they received "basic information" from Jimenez in their reports and depositions, meaning that the State necessarily failed to disclose the full substance of Jimenez's oral statements, it is clear that no false testimony was presented at trial. Only Detective Ojeda testified at trial, and he did not testify about Jimenez's cooperation or lack thereof with police during his interview. In fact, Detective Ojeda did not testify to any statements Jimenez made during his interview based on the State's agreement in connection with Jimenez's motion to suppress any statements made during that interview. Thus, because no testimony was presented at trial on these subjects, there is no *Giglio* violation. *See Jimenez*, 997 So. 2d at 1070 (explaining that "supposed false testimony" that is "not presented during the trial . . . cannot form the basis for a *Giglio* claim").

Assuming, arguendo, that any argument by the prosecutor at trial was misleading in light of Jimenez's statements to detectives that might evince his cooperation with law enforcement or innocent contact with the victim or her apartment, Jimenez would still not be entitled to relief.

Considering the cumulative effect of what Jimenez contends was misleading argument in light of the totality of the evidence introduced at trial, there is no reasonable possibility that the force of any misleading argument by the State concerning Jimenez's alleged cooperation with law enforcement—which was not a

- 40 -

feature at trial—added to the force of any misleading argument by the State concerning Jimenez's innocent contact with the victim or her apartment—where there was no evidence that Jimenez, even by his own statement, ever actually used the victim's phone or was otherwise ever in the position to innocently leave his fingerprint on the inside of the victim's front door—could have affected the jury's verdict. *See Smith*, 572 F.3d at 1334.

Thus, even if Jimenez's subclaim regarding the recently disclosed detective notes of his interview by NMPD detectives were not procedurally barred, he would not be entitled to relief on the merits. Accordingly, we affirm the postconviction court's summary denial of this subclaim.

### (4) Inmate Jeffrey Allen

Jimenez next argues that NMPD's 2018 records submission shows that the State committed a *Brady* violation by failing to disclose information with respect to Jeffrey Allen. Allen is an inmate who was housed with and who informed upon Jimenez but who did not testify against Jimenez at trial. *See Jimenez*, 997 So. 2d at 1071. The State allegedly failed to provide handwritten notes from a March 15, 1993, interview between Detective Diecidue and Allen; a February 8, 1993, phone message from Allen for "Pearce"; a note from Detective Ojeda dated February 9 of an unspecified year indicating that he "spoke with" Allen; and multiple pages of handwritten letters from Allen. Jimenez alleges that these documents indicate that

Allen was acting as a state agent when incarcerated with Jimenez in violation of the Sixth Amendment, before the March 15, 1993, date that Detective Diecidue stated in a 1995 deposition was his first and only contact with Allen. Jimenez claims that these notes and letters constitute *Brady* material because they could have been used to impeach Detective Diecidue. Jimenez also argues that the documents can be used as impeachment evidence to show that the investigation was not a search for truth.

This subclaim is procedurally barred. The State previously disclosed a report by Detective Diecidue reflecting that, prior to his March 15, 1993, interview, "Allen had called several times and advised that he had information relating to this investigation." Further, Jimenez's former counsel deposed Allen on March 11, 1998, at which time Allen stated that he had written notes and several letters about his knowledge of the murder and given them to Detectives Ojeda and Diecidue. At this deposition, Allen stated that he met with the detectives more than once and also referenced phone calls with them. Collateral counsel could have made a specific public records request to NMPD to obtain Allen's letters and notes but did not do so, and in any event, the police reports in this case describe the information that Allen provided to the detectives. There is thus no new evidence that was unavailable to Jimenez by the exercise of due diligence.

- 42 -

Even without the procedural bar, this subclaim is without merit. The first prong under *Brady* is not satisfied because this information is not impeaching. Defense counsel could not have used these documents at trial for impeachment as evidence of prior inconsistent statements, because neither Allen nor Detective Diecidue testified at trial, and Detective Ojeda did not mention Allen in his trial testimony. Nor could the documents have been used at trial to impeach Detective Ojeda for bias or to impeach the caliber of the police investigation, because they do not contain information that shows partiality on the part of the police department. Nor is the information exculpatory, as Allen's status as a jailhouse informant for the State and unilateral communication attempting to benefit from that status have no bearing on the guilt or innocence of Jimenez, and Allen did not testify at trial. Accordingly, there was not a *Brady* violation. We affirm the postconviction court's summary denial of this subclaim.

### (5) Steve Sessler, the private investigator

Jimenez's next subclaim concerns a fax coversheet contained in NMPD's post-warrant records disclosure that shows contact between law enforcement and a private investigator named Steve Sessler on October 16, 1992 (14 days after the victim's murder). Jimenez raised a related claim in 2005, in his first successive postconviction motion, concerning NMPD's collaboration with Sessler. Prior to the 1992 Minas murder at issue here, Sessler had investigated Jimenez in

connection with the October 1990 death of Marie Debas. Sessler had been hired by Debas's boyfriend, Manuel Calderon, whom Jimenez alleged was a member of a drug cartel and had a vendetta against him because Jimenez previously had an affair with Debas.[17] In Jimenez's 2005 motion, he alleged that the State had committed a *Brady* violation by failing to disclose that Sessler provided NMPD with information he had gathered in connection with the Debas case, which Jimenez alleged caused NMPD to unfairly target him for the Minas murder.

This Court affirmed the denial of Jimenez's 2005 claim, concluding that it was procedurally barred because it was not based on newly discovered evidence:

> [I]t had long been common knowledge that the North Miami Police Department was given information that originated from the investigation orchestrated by Calderon. . . . [W]hen Jimenez's trial counsel deposed Detective Diecidue on December 13, 1995, he confirmed that Sessler had provided him with information concerning Jimenez's possible involvement in the death of Debas while the investigation for the murder of Minas was ongoing.

*Jimenez*, 997 So. 2d at 1069. Additionally, this Court concluded that, even if the claim were not procedurally barred, it would be without merit because Jimenez could not establish the materiality prong of a *Brady* claim:

> If evidence of Calderon's influence had been presented during the trial, this would have opened the door to potentially damaging evidence concerning Jimenez's involvement in the death of Debas.

_____

17. After Jimenez's convictions and sentence in this case, Jimenez pled guilty to the second-degree murder of Debas, whose death had been ruled an accidental drug overdose before Sessler's involvement.

Thus, there is not a reasonable probability that if this information with regard to the influence of Calderon had been disclosed to Jimenez, the jury would have reached an alternative verdict.

*Id.* at 1070 (concluding, further, that Jimenez's *Giglio* claim relating to Calderon's influence was "without merit" because the "supposed false testimony was not presented during the trial, so it cannot form the basis for a *Giglio* claim").

Jimenez's present claim adds only that he has discovered within NMPD's 2018 records submission a fax coversheet showing that Sessler communicated with NMPD on October 16, 1992, two weeks into the investigation of the Minas murder. Jimenez asserts that this communication shows the influence of Sessler and Calderon on the investigation very early in the case. This is not new evidence. Accordingly, this claim is procedurally barred. It also fails on the merits for the reason that this Court previously articulated in affirming the denial of the *Brady* and *Giglio* claims related to Sessler that Jimenez raised in his first successive postconviction motion filed in 2005. *See id.* at 1069-70. Accordingly, we affirm the postconviction court's summary denial of this subclaim.

### (6) Anwar Ali, the cab driver

Jimenez also claims that NMPD's post-warrant disclosure contains new *Brady* material related to Anwar Ali, the cab driver who responded to Jimenez's call for a taxi on the night of the victim's murder but who never picked up Jimenez and, instead, picked up a man with a bleeding face several minutes and blocks

away from the apartment complex where the victim was murdered. The postconviction court properly summarily denied this claim, which is procedurally barred and without merit.

In affirming the denial of Jimenez's first successive postconviction motion, this Court found procedurally barred, and alternatively meritless, Jimenez's claim that the State had committed a *Brady* violation by failing to disclose that it had repeatedly attempted to get Ali to identify Jimenez as the man with the bleeding face, even though Ali said the man was not Jimenez, essentially harassing him, and that these efforts had resulted in Ali's refusal to involve himself in this case further. *Jimenez*, 997 So. 2d at 1064-65.

In the claim at issue here, Jimenez does not suggest that NMPD's disclosure goes to the substance of the testimony that Ali would have had to offer had he testified at trial, namely "that he picked up a person, who stated that he had been mugged and was bleeding from the face, approximately sixteen blocks from the crime scene and approximately thirty minutes after the murder." *Id.* at 1065. Rather, Jimenez claims that NMPD's failure to provide him, before trial, with Ali's address and phone number—which NMPD's recent disclosure indicates it had—at a time when Jimenez was trying to secure Ali's trial testimony is new evidence that amounts to a *Brady* violation. Jimenez further argues that law enforcement's

deceit with respect to the handling of Ali is new evidence of valuable impeachment because it shows the investigation was not a search for the truth.

Jimenez's arguments are procedurally barred. That NMPD had Ali's contact information is not new evidence. Although Jimenez was unsuccessful in his attempt to subpoena Ali to testify at trial, there is plentiful evidence establishing that, with the exercise of due diligence, the defense could have contacted Ali. For example, defense counsel knew that the State had been able to contact Ali, as defense counsel extensively questioned both Detectives Ojeda and Diecidue about Ali during their respective pre-trial depositions. Further, during Detective Ojeda's deposition, defense counsel informed Detective Ojeda about statements regarding picking up a man with a bleeding face that Ali had allegedly made to an investigator for the defense (who also clearly had contact with Ali), and Detective Ojeda stated that he was going to follow up. With the exercise of due diligence, defense counsel could have, too.

The fact that Detective Diecidue wrote down Ali's name and phone number is also not new evidence since Jimenez knew that the detective had been in contact with Ali. While Jimenez claims that this notation reflects that Detective Diecidue interviewed Ali but chose not to take notes because the information Ali provided was favorable to Jimenez, the notes do not indicate that they are from an interview with Ali. But, even accepting for the sake of argument that Jimenez is correct, this

is also not new evidence. If it actually occurred, whatever impeachment value

Detective Diecidue's decision to document only a name and number may have had

is part and parcel of the impeachment value inherent in Detective Diecidue's "lost"

report of Ali's interview discussed by both Detectives Diecidue and Ojeda in their

pre-trial depositions, which is not new because Jimenez has known about the "lost"

report since 1993.

Similarly, although Jimenez argues that Detective Ojeda never disclosed that

he had an interview with Ali, the recently disclosed notes suggest that Detective

Ojeda followed up with Ali after his July 1993 deposition, just as he told defense

counsel at the deposition he was going to do.[18] The notes are consistent with the

information the State previously disclosed to Jimenez and with other information

that it is clear from Detective Ojeda's deposition Jimenez already had and, in fact,

alerted the State to (i.e., Ali's description of encountering the man with the

bleeding face). Thus, these notes are not new evidence.

Finally, even without the procedural bar, Ali's testimony would not have

been exculpatory or impeaching as required to establish the first prong of *Brady* for

_____

18. Although Detective Ojeda's notes do not include the year, they identify
the month as September. Because the victim was murdered in October of 1992, an
interview in September in connection with the murder investigation would
necessarily have had to have occurred at least a year after the victim's murder, in
September 1993, which also necessarily would have been after Detective Ojeda's
July 1993 deposition.

- 48 -

the reasons we previously expressed. *See Jimenez*, 997 So. 2d at 1065 (explaining that Ali's account of picking up the man with the bleeding face blocks away from the crime scene and thirty minutes after the victim's murder "would not have logically connected the person that he picked up in his cab to the murder" or "impeach[ed] any of the evidence presented by the State during the trial"). Accordingly, we affirm the postconviction court's summary denial of this subclaim.

**(7) Detective Ojeda's trial preparatory materials**

Finally, Jimenez argues that an 11-page document that he claims was written by the prosecutor to prepare for Detective Ojeda's trial testimony, and which the postconviction court denied Jimenez leave to address in his successive postconviction motion, is new evidence of a *Brady* violation. Had his motion to amend been granted, Jimenez would have argued that this document—which he acknowledges is consistent with Detective Ojeda's trial testimony—is undisclosed impeachment evidence. Even assuming for the sake of argument that the postconviction court should have granted Jimenez's motion to amend, this claim is both procedurally barred and conclusively refuted by the record. *See Zakrzewski*, 115 So. 3d 1004.

"[P]rosecutors are permitted to discuss testimony with witnesses . . . ." *Hartley v. State*, 990 So. 2d 1008, 1015 (Fla. 2008). Although trial preparatory

materials that are exculpatory or impeaching because, for example, they "reveal[] coaching by the prosecutor[, contain] conflicting accounts of the witness's testimony," or "indicate any testimony contrary to that presented at trial" can give rise to *Brady* claims, *Tompkins v. State*, 872 So. 2d 230, 239 (Fla. 2003), the document at issue in this case is neither exculpatory nor impeaching. Rather, it contains answers to questions that are consistent with Detective Ojeda's reports and deposition testimony, which were available to Jimenez before trial. Therefore, it contains nothing new. *Cf. Mills v. State*, 507 So. 2d 602, 604 (Fla. 1987) ("Our examination does not show that the State put words in this witness'[s] mouth. Even though some of the questions [the State provided to its witness] contained answers to those questions, there is no evidence that these answers emanated from any source other than the witness.").

Furthermore, the record conclusively refutes Jimenez's speculation of nefarious intent on behalf of the State in terms of the prosecutor somehow working with Detective Ojeda to keep information about a white van from the jury because the word "out" was written in the margin next to questions regarding the van. Before Detective Ojeda testified at trial, the prosecutor asked another NMPD officer, Officer Sidd, a question concerning whether Officer Cardona's investigation of the white van led her to conclude that the individuals in the van were not involved in the murder that is virtually identical to the question denoted

- 50 -

with the word "out" in the document at issue, and the trial court sustained defense counsel's objection. In other words, it was not the prosecutor but the trial court that (properly) kept this (hearsay) testimony "out," although the jury was permitted to hear testimony from at least four witnesses, three of whom were law enforcement officers, relating to the white van.

Accordingly, even if the recently disclosed document presents anything new, on the merits, because the document is neither exculpatory nor impeaching, it fails under the first prong of *Brady*.

In conclusion, all seven of the subclaims that Jimenez raised or sought to raise in his sixth successive postconviction motion are procedurally barred and, in any event, without merit. Although Jimenez argues that the postconviction court did not properly consider the force of all of the *Brady* and *Giglio* violations evinced in the new evidence when it assessed materiality, there is no newly discovered evidence in NMPD's post-warrant submission. Accordingly, all of Jimenez's claims are procedurally barred and due to be summarily denied on that basis alone. To the extent our alternative merits analysis reached materiality for the *Brady* violations alleged in Jimenez's third and fifth subclaims, adding up the force of Jimenez's own statements—that do not place him in the position to innocently leave his fingerprint on the inside of the victim's front door or put him cooperating with law enforcement in any way that mattered to the evidence

actually presented at trial—plus the force of a fax coversheet showing a Sessler/Calderon connection to NMPD's investigation of the victim's murder—that if introduced would open the door to damaging evidence concerning Jimenez's involvement in another person's death—and weighing it against the totality of the evidence introduced at trial, this evidence could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Smith*, 235 So. 3d at 268-69 (quoting *Kyles*, 514 U.S. at 435). Further, although we alternatively reached materiality for the *Giglio*/due process argument Jimenez raised in his third subclaim with respect to the State's arguments concerning Jimenez's innocent contact with the victim or her apartment and his cooperation with detectives during his interview, there are no additional instances of false testimony or misleading argument to consider cumulatively with the materiality analysis we already conducted for that subclaim. Jimenez is not entitled to relief, singularly or cumulatively, on his allegations that NMPD's post-warrant records disclosure evinces *Brady*, *Giglio*, due process, and discovery violations.

## CONCLUSION

For the reasons above, we affirm the postconviction court's orders summarily denying Jimenez's fifth and sixth successive postconviction motions pursuant to rule 3.851, the postconviction court's order denying Jimenez's motion to correct illegal sentence pursuant to rule 3.800(a), and the postconviction court's

order denying Jimenez's motion to amend his sixth successive postconviction motion. We further lift the stay of execution entered on August 10, 2018. No rehearing will be entertained by this Court, and the mandate shall issue immediately.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, and LAWSON, JJ., concur.
LEWIS, J., concurs in result.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.

PARIENTE, J., concurring in part and dissenting in part.

I agree that Jimenez is not entitled to relief on his second post-warrant appeal regarding newly discovered evidence (No. SC18-1321). *See* majority op. at 19-52.[19] However, I dissent from affirming the postconviction court's denial of Jimenez's first post-warrant appeal regarding Florida's lethal injection protocol (No. SC18-1247). *See* majority op. at 7-17. For the reasons explained below, I would reverse and remand for an evidentiary hearing on these claims.

---

19. As to the majority's discussion of this issue, I reiterate the importance of "express[ing] the prejudice prong of *Brady* [*v. Maryland*, 373 U.S. 83 (1963),] in terms of a probability sufficient 'to undermine confidence in the verdict' and not a reasonable probability of a different result." *Pittman v. State*, 90 So. 3d 794, 822 (Fla. 2011) (Pariente, J., concurring in result) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).

## Florida's Lethal Injection Protocol

For the fifth time since this Court's decision in *Asay VI*,[20] Florida will execute a death-sentenced defendant using a lethal injection protocol that the defendant argues is in violation of the Eighth Amendment to the United States Constitution. *See* majority op. at 13. Indeed, the majority relies on *Asay VI* to deny Jimenez relief on these claims. *See* majority op. at 14-15. However, Jimenez challenges Florida's lethal injection protocol in light of new and troubling information, specifically regarding Florida's most recent execution, which, at the very least, should be fully developed at an evidentiary hearing. I disagree with the majority that Jimenez's claims "are insufficient to require revisiting our holding in *Asay VI*." Majority op. at 16.

In my dissenting opinion in *Asay VI*, I explained that Asay was unconstitutionally denied access to documents that may have supported his claim that Florida's new lethal injection protocol—which replaced midazolam with etomidate as the first drug in the protocol, intended to induce unconsciousness—violates the Eighth Amendment's bar against cruel and unusual punishment. 224 So. 3d at 705-08 (Pariente, J., dissenting). Although *Asay VI* is now final, Jimenez presents new, additional evidence from the executions Florida has performed since that decision—Mark Asay on August 24, 2017, Michael Lambrix on October 6,

---

20. *Asay v. State* (*Asay VI*), 224 So. 3d 695 (Fla. 2017).

2017, Patrick Hannon on November 8, 2017, and Eric Branch on February 22, 2018—regarding the possibility that the lethal injection protocol subjects the defendant to cruel and unusual punishment.

As to the administration of the first drug in the lethal injection protocol, etomidate, the postconviction court wrote in its order denying Jimenez's motion: "As the administration of the etomidate commenced, Branch released a guttural yell or scream. . . . Branch's legs were moving, his head moved, and his body was shaking." Order, at 4.[21] His body "continued to shake and his chest was heaving for another four minutes." Initial Br., at 38. The postconviction court noted and the majority accepts that all of this took place "before the consciousness check was performed before the subsequent administration of the second and third drugs." Order, at 4; majority op. at 15. Dr. Lubarsky, "an experienced anesthesiologist," Initial Br., at 29, opined that this was "indicative of insufficient anesthetic depth prior to the administration of the second and third drugs." *Id.* at 38.

As to the second and third drugs, Jimenez alleges that—according to Dr. Lubarsky's review of Florida's lethal injection protocol and records from Branch's execution—Branch had only "1/10th of the clinical dose of etomidate . . . in his bloodstream" by the end of the execution process, an amount that is "insufficient to

_____

21. The postconviction court's Order Denying Successive Motion to Vacate Judgments of Conviction & Sentence is cited herein as "Order."

ensure that" he did "not feel the excruciating pain of the second and third drugs." *Id.* at 31. In Dr. Lubarsky's opinion, Branch's scream was "objective evidence" of his "experiencing significant pain during [the] execution," *id.* at 35— not "in protest of his execution or a reaction to etomidate." Majority op. at 15. Of course, this information was unknown when this Court rejected Asay's challenge to the new lethal injection protocol.

In my view, this new information makes it impossible to allow another execution to proceed without thoroughly reviewing whether Florida's lethal injection protocol subjects defendants to a substantial risk of pain, in violation of the Eighth Amendment. Thus, I would reverse and remand for an evidentiary hearing.

Further, I reiterate my long-standing concern that a one-drug protocol has a greater likelihood of reducing any substantial risk of pain. Specifically, Florida's continued use of a paralytic agent, such as rocuronium bromide, could lead to a situation where defendants like Jimenez are entirely aware of the execution, including the attendant extreme pain and suffering, but unable to inform anyone of or indicate such awareness. *See* Initial Br., at 49. I again urge the executive branch to adopt a one-drug protocol to avoid this unconstitutional risk. *See Asay*

*VI*, 224 So. 3d at 705 (Pariente, J., dissenting) (quoting *Schwab v. State*, 973 So. 2d 427, 429 (Fla. 2007) (Pariente, J., concurring)).[22]

### Short Warrant Period

Finally, I note the seriously constricted warrant period in this case. As the majority explains, Governor Scott signed Jimenez's death warrant on July 18, 2018, scheduling his execution for 27 days later—August 14, 2018. Majority op. at 4 & n.1. The original scheduling order determined July 31, 2018, as the "deadline for completing proceedings before the postconviction court." Majority op. at 7.

This extremely short warrant period created a fire drill approach to the review of Jimenez's claims. It was not until after the postconviction court denied Jimenez's sixth successive postconviction motion (filed on August 6, 2018) that this Court entered a stay of execution. *See* majority op. at 6. The postconviction court and Jimenez's attorneys were forced to race against the clock in reviewing and presenting all of Jimenez's claims, respectively. But for this Court entering a

---

22. Indeed, it appears that many other states that still impose the death penalty have adopted one-drug protocols. Eight states—Arizona, Georgia, Idaho, Missouri, Ohio, South Dakota, Texas, and Washington—have used a single-drug method for executions. Six other states—Arkansas, California, Kentucky, Louisiana, North Carolina, and Tennessee—have announced plans to use a one-drug protocol. Death Penalty Info. Ctr., *State by State Lethal Injection*, https://deathpenaltyinfo.org/state-lethal-injection (last visited Aug. 6, 2018).

stay of execution as a result of Jimenez's second post-warrant appeal, this Court would have also had inadequate time to thoroughly review his claims.

While I realize that all proceedings should be completed by the time the Governor signs a death warrant, some claims, such as those challenging the execution method, cannot be raised or evaluated until the signing of the death warrant. At the least, defendants must have adequate time to investigate and raise and courts must have adequate time to properly review these warrant-based claims.

Since executions resumed in Florida after *Hurst*, the judicial system—the circuit courts, this Court, and the United States Supreme Court—has been faced with increasingly short warrant periods, the shortest being the one in this case—a mere 27 days.[23] However, the Legislature—tasked with providing "the method, the means, and the instrumentalities for executing death sentences imposed by the courts pursuant to the law," *Abdool v. Bondi*, 141 So. 3d 529, 543 (Fla. 2014) (quoting *Blitch v. Buchanan*, 131 So. 151, 155 (Fla. 1930))—has determined that a warrant period of 180 days is reasonable. *See* § 922.052(2)(b), Fla. Stat. (2018); *Abdool*, 141 So. 3d at 544. Thus, I urge the Executive branch, in setting warrant

---

23. The warrant period for Asay's execution was 52 days. *Asay VI*, 224 So. 3d at 699. The warrant period for Lambrix's execution was 34 days. *Lambrix v. State*, 227 So. 3d 112, 112 (Fla. 2017). The warrant period for Hannon's execution was 33 days. *Hannon v. State*, 228 So. 3d 505, 508 (Fla. 2017). The warrant period for Eric Branch's execution was 34 days. *Branch v. State*, 236 So. 3d 981, 983-84 (Fla. 2018).

periods, to consider the judicial proceedings that must be completed before the date of execution.

## CONCLUSION

For these reasons, while I agree that Jimenez is not entitled to relief on his newly discovered evidence claims, I would reverse and remand for an evidentiary hearing on his claims challenging Florida's lethal injection protocol.

QUINCE, J., concurs.

An Appeal from the Circuit Court in and for Miami-Dade County,
    Richard L. Hersch, Judge - Case No. 131992CF0341560001XX

Martin J. McClain and Linda McDermott of McClain & McDermott, P.A., Wilton Manors, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida, and Melissa Roca Shaw, Assistant Attorney General, Miami, Florida,

    for Appellee